## The People on the relation of The Attorney General v. The Lake Superior Ship Canal, Railroad & Iron Company and another.

*Portage ship-canal: Right of possession: Tolls.* The right of the respondent company, under the legislation of congress and the state legislature in that regard, to the possession of the Portage ship-canal, and to collect

ATTORNEY GENERAL *v.* LAKE SUPERIOR SHIP CANAL, ETC.,
COMPANY.

the tolls, is considered and sustained, as against the claim of the state as
trustee of the United States.

*Land grants: Reserved right of free passage: Statutes construed.* The pro-
vision of the act of congress, requiring the canal to be a public highway
free of toll for United States vessels, is held not to evince a purpose to
create by the act a trust in the possession of the state for the United
States; similar provisions for free right of passage in United States land
grants for railroads have never been construed as making the roads gov-
ernment roads.

*Land grant: Legislation construed: Approval of state action.* The act of
congress of 1866, making a further grant of lands to aid in the construc-
tion of said canal, expressly recognizes and impliedly approves the pre-
vious action of the state, by declaring the additional grant to inure to
the use and benefit of the respondents, upon whom the state legislation
had before conferred the original grant under the specified conditions,
absolutely divesting the state of any pecuniary interest or burden.

*Land grants: Action of congress: Presumed notice: Authority of state: Choice
of agencies.* Both these land grants must be assumed to have been made
by congress with a knowledge of the provision of the state constitution
inhibiting the state from engaging in any work of internal improvement,
as well as to comply with the expressed will of the state as contained
in the joint resolution of January 21, 1865, asking aid for this work; and
the acts of congress confirming these grants must be regarded as intended
to leave the state full discretion in the choice of agencies, as had before
been done with the railroad grants.

*Portage ship-canal: Land grant: State legislation: Contract rights: Posses-
sion.* The action of the state, in conferring this grant upon the respond-
ent company, came clearly within the purview of the acts of congress,
and fixed a contract right in the company, with a right of possession.

*Land grant: Statute construed: Reserved right of purchase: Possession.* The
fact that provision is made for the extinguishment of any beneficial right
by a refunding of the cost and expenses with interest, whatever effect
it might have on the standing of the company, as a trustee or otherwise,
after its beneficial interest had been paid for and terminated, could cer-
tainly have no force to deprive them of their full possessory rights until
such extinguishment.

*Heard April 30.     Decided June 15.*

Information in the nature of a *Quo Warranto.*

*Andrew J. Smith, Attorney General,* and *Isaac Marston,* for
relator.

*J. W. E. York, Alfred Russell* and *Ashley Pond,* for re-
spondents.

CAMPBELL, J:

This information was filed to determine the right of the
respondent corporation to collect the tolls on the Portage

Ship Canal.   The only question presented is, in whose custody was it contemplated that the canal should remain after its completion.   It is claimed on behalf of the prosecution, that the possession of it is to be in the state as a trustee for the United States, and by the respondent, that the canal company is to possess it.   There is no question on either side but that the tolls are to be fixed by the laws and authority of the state.

The history of the enterprise as shown by the record and the public acts of which the court is judicially informed, is as follows:

In 1864, the respondent corporation was ,incorporated under the Canal and Harbor Act (now found in *chapter 84* of the *Compiled Laws of 1871*), for the purpose of building the work in question.   The lands required for its purposes were all private property, and subject to the eminent domain of the state.   It seems to have been supposed there were some United States lands on the line, or else, from abundant caution, provision was made for such a contingency by the act of congress to be referred to.   All companies organized under the statute were to own their canals, but were limited to the collection of such tolls as should be fixed by the appointed authorities.

On the 21st day of January, 1865, the legislature of Michigan passed a joint resolution, representing to congress that this work was important, and "involves an expenditure of such magnitude, that unaided individual enterprise may not be equal to its accomplishment, unless quickened by a just stimulant from national bounty;" and therefore requested our senators and representatives to obtain a land grant "in aid of the construction of a ship-canal from Portage Lake to Lake Superior."

On the 3d of March, 1865, congress responded to this request by passing an act which provided for an appropriation of lands, and authority to build the work over public lands.   The provisions which become important will be referred to.

The act is entitled "An act granting land to the state of Michigan, to aid in building a harbor and ship-canal at Portage Lake, Keweenaw Point, Lake Superior."—*13 L. U. S., pp. 519, 520.*

The first section grants "to the state of Michigan the right of locating and constructing a breakwater and harbor and ship-canal through any public lands at or upon the neck of land on Lake Superior known as 'the Portage,'" with provisos concerning the dimensions of the canal, and of the land occupied. The second section grants to the state of Michigan "for the purpose of aiding said state in constructing and completing a harbor and ship-canal," etc., two hundred thousand acres of land.

The third section provides that the lands shall be subject to the disposal of the legislature of the state, "or if the legislature thereof shall not be in session, or shall adjourn within ten days after the passage and approval of this act, then said lands shall be subject to the disposal of the governor and board of control of said state, for the purpose aforesaid, and for no other; and the said canal shall be and remain a public highway for the use of the government of the United States, free from toll or charge upon the vessels of said government, or upon vessels employed by said government in the transportation of any property or troops of the United States."

Section four required copies of the plans to be filed before the state should dispose of the lands. Section five provided for a reversion of the lands, unless the breakwater, harbor and canal should be finished in two years. Section six provides that the legislature "shall cause to be kept an accurate account of the sales and net proceeds of the lands hereby granted, and of all expenditures in the construction, repairs, and operating of said canal, and of the earnings thereof, and shall return a statement of the same, annually, to the secretary of the interior; and whenever said state shall be fully reimbursed for all advances made for the construction, repairs, and operating of said canal, with legal

interest on all advances, until the reimbursement of the
same, or upon payment by the United States of any balance
of such advances over such receipts from said lands and
canal, with such interest, the said state shall be allowed to tax,
for the use of said canal only, such tolls as shall be suffi-
cient to pay all necessary expenses for the care, charge, and
repair of the same."

On the 18th of March, 1865, the legislature of Michigan
passed an act of acceptance of this grant.—*L. 1865, p.
474.* The first section accepts the "lands, franchises,
rights, powers, and privileges granted to and conferred upon
the state of Michigan" by the the act of congress, "with
the restrictions, and upon the terms and conditions contained
in said act of congress." Section two grants the lands to
the respondent, "subject to all the conditions, restrictions,
and obligations herein mentioned : *And provided,* That none
of said lands shall be actually sold, or otherwise disposed of,
except for the purposes of hypothecation, until said canal
and harbor shall be completed and accepted, as hereinafter
specified." Sections three and four provide for the appoint-
ment of an engineer by the governor, and the surveying
and plans, and the construction in conformity thereto ; and
that, upon completion and approval by the engineer and
governor, the company may dispose of the lands as absolute
owner. Section five provides that, "All expenses incurred
under and by virtue of this act, shall be paid by the com-
pany, and the state shall not in any wise be holden there-
for." Section six reserves to the state the right to regulate
the tolls, and provides that so far as necessary they shall be
applied to the improvement and preservation of the work in
such manner as it may prescribe.

On the third of July, 1866, congress made a further
grant, whereby there was "granted to the state of Michi-
gan, to aid in the building of a harbor and ship-canal at
Portage Lake, Keweenaw Point, Lake Superior, in addition
to a former grant for that purpose, approved March 3,
1865, two hundred thousand acres of land in the Upper

Peninsula of the state of Michigan," etc. * * * "Said grant of lands shall inure to the use and benefit of the Portage Lake and Lake Superior Ship Canal Company, in accordance with an act of the legislature of the state of Michigan, conferring the land granted to the state, by the act herein referred to, on said company." . This act extended the time for completing the canal three years.

In 1873 the legislature appointed the governor, auditor general and state treasurer a board of control to regulate the tolls and management of the canal, and to appoint a superintendent to take charge of it, and be paid out of its earnings.

The meaning of the original act of the state legislature, in regard to the custody of the canal, is not open to any serious question, and if the state had power to allow it to be in the company's possession, it has plainly so declared its purpose. The terms imposed are merely conditions on which they are to receive the land grant. They are dealt with as a company already existing for the purpose of building the canal, and under the general canal act they could have built it at their own expense, if they chose, and collected tolls. The act of 1865, dealing with them on their corporate basis, confers the congressional grant upon them under the specified conditions, absolutely divesting the state of any pecuniary interest or burden, compelling the company to pay all expenses, even of the state engineer, and subjecting them to a state regulation of tolls. But the tolls are made expressly "to be received by said company for the use of said canal and harbor."

The constitution of the state declares that, "The state shall not be a party to, or interested in, any work of internal improvement, nor engaged in carrying on any such work, except in the expenditure of grants to the state, of land or other property."—*Art. XIV. § 9.*

When the state applied to congress, it was evidently with this provision in view. The application was for such aid as would be a stimulant from national bounty to "indi-

vidual enterprise," and not for enough to build the entire work. The congressional grant as plainly contemplates that the work will need the expenditure of money beyond the land grant. And unless the work was done within two years, the entire grant was to revert, so that the state, even if it had been meant as a sufficient appropriation, could not have raised money by an absolute sale of the lands, and must have obtained it by means which would have been in evasion, if not in violation of the constitution. The act of the legislature is cautiously drawn to prevent the expenditure of a dollar of state money under any circumstances. It negatives as plainly as language can be drawn, any possibility of state management by state functionaries, and it declares very clearly that the company shall hold the canal and receive the tolls, subject to be fixed, but not to be collected by the state.

The argument against this seems to rest on the claim that the whole purpose of the act of congress is to create a trust for the United States in the possession of the state. This is rested on two provisions, one requiring the canal to be a public highway free of toll for United States vessels, and the other providing that when the whole expenditures are reimbursed, with interest, either by tolls or by payment from the United States, the subsequent tolls shall be confined to what may be necessary to manage and preserve the canal and works.

The first of these provisions is substantially the same as that contained in the United States land grants for railroads. The act of June 3d, 1856 (*11 U. S. L., 21*), granted to the state of Michigan large amounts of land "to aid in the construction of railroads" between various points named. That act, like the present, contained no reference to any companies, and dealt only with the state, and by section three it was provided, "that the said railroads shall be and remain public highways for the use of the government of the United States, free from toll or other charge upon the transportation of any property or troops of the United

States." The state of Michigan disposed of all these grants in aid of railroad corporations, and congress, before the act of March 3d, 1865, had recognized this disposal as one contemplated, and acted upon it,—*12 U. S. L., 620; 13 U. S. L., 119, 520;* and has since repeatedly extended the time for building such roads. There is nothing which will bear the construction that any of these became government roads or ways, by reason of this free right of passage.

The act of congress of 1866 expressly recognizes, and impliedly approves the action of the state, by declaring the additional grant to inure to the use and benefit of the respondents. Both of these acts must be assumed to have been passed by congress with a knowledge of the state constitution, as well as to comply with the expressed will of the state, and they must be regarded as intended to leave the state full discretion in the choice of agencies, as had been done with the railroad grants.

There is another very significant provision in the first congressional grant. It provides that if the legislature is not in session, the lands shall be disposed of by the governor and board of control, at the same time requiring the work to be done within two years on pain of reversion. If this work was expected to be done by the state, congress must have known it would need legislation. There were only two boards of control then existing. One was the board provided for by the act accepting the first railroad grant, whose duties were confined to dealing with the lands for purposes to be subserved by railroad companies.—*L. 1857, p. 346, et seq. § 8.* The other was the board of control of the St. Mary's Ship Canal, which had no authority to undertake, or construct any such work. The former is probably the one intended, as its action had been brought to the knowledge of the United States in disposing of the land grants. No disposal could have been made by either of these boards, except by contract with some corporation or other contractor, and neither of them could bind the state to any burden.

It is beyond doubt that the action of the state came

within the purview of the acts of congress, and fixed a contract right in the corporation, with a right of possession.

There is nothing, as we think, in the point that any beneficial right is liable to be extinguished by a refunding of the cost and expenses with interest. The information required to be sent annually to the secretary of the interior, of the proceeds, earnings and expenditures, is covered by the annual report already required to be made by all such companies.—*C. L.*, § *2700.* It is not very important to consider now what may be the standing of the company, as a trustee or otherwise, after its beneficial interest has been paid for and terminated. The statute under which the corporation was organized already provided that the county might purchase the canal by refunding capital and further cost and expenses with interest.—*C. L.* § *2714.* This in no way interfered with the full possessory rights of the company, until such extinguishment. All the railroads chartered by the territory of Michigan, which were ever organized, were subject to purchase by the territory at a fixed percentage.—*Laws 1832 p. 75; L. 1834, p. 49, 80; L. 1835, p. 18, 54, 95, 112.* The same policy is found in all the subsequent state legislation, and the right was reserved in the sale of the Michigan Central Railroad.— *L. 1846, p. 62.*

It is hardly claimed that if this right of tolls was granted to or vested in respondents, it was competent for the state to violate its contract, and assume to manage this work of internal improvement for itself. The act of 1873 was passed, no doubt, merely to provide for the state control if it was not in the company, and not with any design of destroying contract rights.

We think the company is not guilty of any usurpation in collecting the tolls, and that judgment must be entered in their favor.

GRAVES, CH. J., concurred.

32 MICH.—31.

ATTORNEY GENERAL *v.* LAKE SUPERIOR SHIP CANAL, ETC.,
COMPANY.

COOLEY, J:

I agree in the conclusions of my brethren, believing that if the interests of the United States and of the state are not sufficiently protected as they should have been, the fault is to be referred to the want of proper precautions in the legislation.

MARSTON, J., having been of counsel while attorney general, did not sit in this case.