SANGER (FERSON v.). See Cases Nos. 4,-751, and 4,752.

## Case No. 12,319.

### SANGER v. SARGENT.

[8 Sawy. 93.] [1]

Circuit Court, D. California. Sept., 1874.

PUBLIC LANDS — RAILROAD GRANTS—"RESERVED" LANDS—MEXICAN GRANTS.

[1. Under the act of July 1, 1862, granting lands to certain railroad companies to aid in the construction of a railroad and telegraph line from the Missouri river to the Pacific Ocean, there was a present grant, which attached to particular sections within the prescribed limits upon the definite location of the road, unless such lands were excepted or reserved from the operation of the act, and this grant could only be defeated by failure to perform the conditions of building the road as prescribed.]

[2. Lands in California, which were claimed at the time of the definite location of the road under alleged Mexican or Spanish grants, which were in fact fraudulent and void, and were afterwards so declared by the proper court, passed by the grant to the railroad companies; and were not excepted or "reserved," so as to be excluded from the grant either by the act of 1851, to settle private land claims in California, or by the act of 1852, providing for the survey of public lands in that state, or by the acts of March 3, 1853, to extend pre-emption rights to such lands.]

[Cited in U. S. v. McLaughlin, 30 Fed. 157.]

In equity.

SAWYER, Circuit Judge. The complainant filed his bill in equity against the defendants for the purpose of establishing his right to certain lands, which have been patented by the United States to the defendants, and procuring a decree for the conveyance of such title as passed by virtue of the patents. The complainant claims to be entitled to the lands by virtue of certain acts of congress and transactions thereunder set out in the bill, and he alleges that defendants, notwithstanding his right to the lands, have wrongfully procured patents to be issued to themselves. The defendants demur to the bill, and the question to be determined is whether the facts alleged, taken to be true, entitle complainant to the relief sought. According to the allegations of the bill, complainant has acquired by proper mesne conveyances all the right, title, and interest vested in the Central Pacific and Western Pacific Railroad Companies, under the acts of congress granting lands to said corporations to aid in the construction of the Western Pacific Railroad. The right of the complainant depends upon whether the said corporations under which he claims, acquired a right to the land under the acts of congress set out in the bill. Section 3 of the act of July 1, 1862 [12 Stat. 489], "to aid in the construction of a railroad and telegraph line, from the Missouri river to the Pacific Ocean," etc., provides as follows:

"That there be and is hereby granted to the said companies, for the purpose of aiding in the construction of said railroad and telegraph line, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores thereon, every alternate section of public land, designated by odd numbers, to the amount of five alternate sections per mile on each side of said railroad, on the line thereof, and within the limits of ten miles on each side of said road, not sold, reserved, or otherwise disposed of by the United States, and to which a pre-emption or homestead claim may not have attached, at the time the line of said road is definitely fixed." 12 Stat. 492.

That this section constitutes a present grant

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

of the number of sections mentioned, which becomes definitely attached to the specific alternate sections situate within the limits prescribed in the act, not reserved or excepted by virtue of the words of reservation or exception, as soon as "the line of said road is definitely fixed," there can be no doubt. This is both clearly apparent from the language of the act itself and is thoroughly settled by judicial construction in many cases wherein the language is precisely similar. Doll v. Meador, 16 Cal. 315; Van Valkenburg v. McCloud, 21 Cal. 335; Higgins v. Houghton, 25. Cal. 255; Bludworth v. Lake, 33 Cal. 261; Chapman v. School Dist. [Case No. 2,608]; Lamb v. Davenport [Id. 8,015]; Central Pac. R. R. Co. v. Dyer [Id. 2,552]; Lessieur v. Price, 12 How. [53 U. S.] 75, 76; Foley v. Harrison, 15 How. [56 U. S.] 446; Hannibal & St. J. R. Co. v. Smith, 9 Wall. [76 U. S.] 97, 99, 100; Burlington & M. R. R. Co. v. Fremont County, Id. 94, 95.

This grant could only be defeated by a failure to perform the conditions of building the road as prescribed. When the line of the road became "definitely fixed" in the mode prescribed, the right of the railroad companies under which complainant claims attached to every alternate section of the public land within the limits prescribed of ten miles on each side of the road, which was not mineral lands, had not at that time been "sold, reserved, or otherwise disposed of by the United States, and to which a pre-emption or homestead claim," or some other right under the statutes, had not attached. A subsequent act [14 Stat. 538] extended the grant to ten, instead of five, sections, to be selected within twenty miles on each side of the line, and defined the exceptions in more specific terms, which in no way affect the question at issue. Upon the filing by the company of a map designating the general route of the road, the act, with the amendments, also authorized the secretary of the interior to withdraw the land within twenty-five miles of such designated route from pre-emption, private entry, or sale. The bill alleges that said map was filed, designating the general route, October 5, 1864; and that on December 1, 1864, the secretary of the interior withdrew the lands within twenty-five miles of the route so designated from pre-emption, private entry, or sale.

The bill avers that the lands in question are within the prescribed limits; were, at the time of the said withdrawal, and "at the time when the line of the said road was definitely fixed," public lands of the United States, and were alternate sections designated by odd numbers, and not within any of the said exceptions mentioned in any of the said acts. If this be so, then the right of the company vested and became perfect, and it was entitled to a patent upon fulfilling the prescribed conditions, and no other party could acquire any right under the laws in force against the said railroad corporations, after the line of

the said road became "definitely fixed," and the grant had become thus attached to these specific tracts. See cases before cited.

The only ground upon which it is claimed that these lands are within the exception, and, therefore, excluded from the grant, is that they had been "reserved." The bill alleges in direct terms that they had not been reserved. The bill, however, makes the further allegation, that the only reason that patents were not issued to complainant was "that at the date of the final location of the road there was a claim to said land, under a Mexican grant, which said claim was without any foundation, and was wholly void, and was finally rejected by the supreme court of the United States in December term of 1864, long before said portion of said road was completed that gave the right to the said lands; and the said Mexican claim was rejected because the alleged grant on which the claim was founded was a fraud, and was absolutely void"; that it was pretended by the officers of the government "that the fact of said lands being so claimed made them 'reserved' under the act of congress, whether said claim was just or unjust, legal or illegal, and that on this account alone" the issue of a patent to complainant was refused. This allegation presents the only other question in the case on the merits, viz. whether the mere fact that the lands in question at the time the filing of the map required, the time of the withdrawal from pre-emption, private entry, or sale, and the time of the final location of the line of the road, and were within the exterior boundaries of a tract claimed under a Mexican grant, whether fraudulent or genuine, of itself constitutes them lands "reserved," within the meaning of the section making the grant. It does not appear, and it is not claimed, that before said definite location, or at any time, there was, in fact, any actual order of the president, or of any department or officer of the government authorized to make one, made, reserving these specific lands, or any lands within the external boundaries of this pretended grant.

That the lands were public lands there can be no doubt. The fact that they were claimed under a fraudulent and invalid Mexican grant did not prevent them being public lands. The final rejection of the grant did not change the ownership of the lands from the claimant to the United States. It was only an adjudication—a judicial determination—that the grant was invalid, and that the claimant never had any right whatever, legal or equitable, entitled to recognition under the treaty with Mexico; or, in other words, an adjudication in a litigation between the only party setting up any claim and the United States that the entire title was in the United States, and that the lands were public, not private, lands. There being no right or title to these lands in any private individual, the proposition that they were always a part of the public domain, or public lands of the United States, from the

time of their cession by Mexico, seems to be so clear that no argument can make it plainer. If a confirmation relates to, and takes effect from, the date of the filing of the petition, or the date of the grant, as held in many cases, a rejection must have the same relation. But there is no occasion to apply the doctrine of relation. Being public lands, they were subject to grant, and were granted, unless within some one of the exceptions made in the granting act. It is not pretended that they are within any exception, unless it be under the head of "reserved" lands.

As before stated, it is not pretended that there was any specific order by any competent authority reserving these lands, or any lands embracing these, or that they are reserved at all, unless by force of some statute, without any further act by any department or officer of the government. No statute has been called to my attention reserving them in express terms from this grant to the railroad, in consequence of their being within the external limits or otherwise of an invalid Mexican grant. The word "reserved" itself, as used in the railroad acts, does not profess to point out what lands are reserved, within the meaning of the act. It does not attempt to define "reserved" land. It does not include any lands not reserved already by other acts, or other words or provisions than the word itself. In other words we must go outside of that word "reserved," as there used, to other acts, to find the lands intended to be designated by it. And going outside of this word, I have been referred to no statute, and I have not found any that appears to me to reserve these lands from grant. I find nothing in the act of 1851 [9 Stat. 631], to settle private land claims in California, reserving any lands of the United States from any grant that congress may see fit to make. So far as I am aware, that act is the first one passed affecting the titles to lands in California. There were no public lands at that time open to sale or pre-emption in the state of California. There were at that time no means by which private rights not already vested or initiated under the laws of Mexico could be acquired in any of the public domain of California. As the said act did not provide for any disposition of the public lands other than to ascertain what grants had already been made by the Mexican government, and to perfect the rights, inchoate or otherwise, in the said grants, and there was no other law by means of which any pre-emption or other rights could be acquired in the public lands of California, and, the president having the power already to reserve any land for the government's specific uses, there was no occasion for making any general reservation in that act to avoid future complications, and none was made. The whole scope and purpose of the act was to ascertain what lands belonged already to private parties, and what to the public domain; and this object must be kept in view in its construction. The disposition of the

public lands to private parties was left for future legislation.

The next act, as far as I am advised, affecting the public lands in California, is in the appropriation made for the survey of the public lands in that state in 1852, 10 Stat. 90, 91. This act authorizes the dividing of a certain amount of the public lands into townships and sections. Also the survey of private claims under Mexican grants presented in good faith for confirmation. But it only authorizes the survey of such unconfirmed grants "as the gradual extensions of the lines of the public surveys as he (the surveyor general) shall find within the immediate sphere of his operations, and which he is satisfied ought to be respected and actually surveyed in advance of confirmation." What does this mean? Certainly not that all lands within the exterior boundaries of a Spanish grant shall be reserved from survey, or reserved at all. On the contrary, it expressly authorizes the surveyor general, when, in extending the lines of the public surveys, he comes upon an unconfirmed Spanish grant of the usual kind, which he is satisfied is good, and ought to be respected, to survey it "in advance of confirmation," in order that he may survey as public lands the surplus, after satisfying the grant, and thus prepare it for sale as soon as congress should see fit to authorize its disposition. Congress had no idea, in passing this act, that all lands within the exterior boundaries of a grant which sometimes embraced ten times the amount of land required to satisfy the grant, and in one case, the whole state of California (see Yturbide v. U. S., 22 How. [63 U. S.] 290, and Fremont's Case, 17 How. [58 U. S.] 573*),[2] had been reserved for any purpose, and certainly up to this time there had been no such reservation.

The act of March 3, 1853, "to extend preemption rights to certain lands therein mentioned" (10 Stat. 244), clearly has no application. It had reference to prior legislation applicable to lands in the older states. There was nothing, at the time of the passage of the act, in California, to which it could apply. But afterwards, on the same day, the next act was passed by congress, relating to lands in California,—the act of March 3, 1853, "to provide for the survey of the public lands in California, the granting of pre-emption rights therein, and for other purposes." 10 Stat. 244–248. This appears to be the first act under which rights in the public lands, as against the United States, could be originally acquired; and this act relates to this specific subject-matter, and cov-

[2] The grant to Yturbide was finally rejected in 1860,—only about two years before the date of the railroad grant in question,—in Newhall v. Sanger [92 U. S. 769]. Had the final rejection been accidentally delayed till July 2, 1862, not a foot of land in California would have passed to the railroad company under the decision in Newhall v. Sanger, and the whole grant would have been defeated by the judgment of the court.

ers and disposes of the entire subject for the present. Section 6 of this act extends the right of pre-emption to California, and excepts from the right of "pre-emption lands claimed under any foreign grant or title." But this act makes no exception of such lands, as such, from any other grant that congress may afterwards see fit to make. Its exception only applies to pre-exemption and other rights to be acquired under that act. Besides, the act itself clearly shows that lands claimed under Spanish grants are not intended by congress to be included under the head of "reserved" lands; for the language of this act is, "with the exception of lands * * * reserved by competent authority," and then adds, "and excepting also the lands claimed under any foreign grant or title." If it had been supposed that the lands within the exterior boundaries of a Spanish grant would be included in the words "reserved by competent authority," the last clause would have been useless. It was not so supposed, but it was intended to add something else. The word "and" indicates some additional lands. The other word, "also," as its definition indicates, shows, too, that there was to be something "further," something "in addition to" the lands already included in the word "reserved," excepted from pre-emption rights; and these further or additional lands were "lands claimed under any foreign grant or title." All these lands were excepted from the operation of the pre-emption laws. They were not reservations. There is a clear distinction between reservations and exceptions. Reservations, in the sense here used, are clearly, "tracts of the public lands reserved for some specific use" (Webst. Dict.), such as for forts, military purposes, Indians, and the like, or lands reserved generally in express terms.

All reservations of this kind, and also lands claimed under Mexican grants, were alike "excepted" from the operation of the preemption laws. Lands "reserved by competent authority" were excepted, and so were lands claimed under Spanish grants excepted, not reserved. So, in like manner, under the railroad acts in question, the term "reserved," is manifestly used in the same sense, and all lands so "reserved," sold, or otherwise disposed of, all lands to which a pre-emption or homestead right had attached, were excepted from the operation of the grant.

The act of congress in relation to Mexican grants in New Mexico also provides that "Until the final action of congress on such claims, all lands covered thereby shall be reserved from sale or otherwise disposed of

by the government, and shall not be subject to the donations granted by the provisions of this act." 10 Stat. p. 309, § 8. This is as specific on this point as the act extending preemption rights to California.

Thus it is apparent that whenever congress designs to except from the operation of any legislative grant, or reserve from sale, those portions of the public lands lying within the bounds of any tract claimed under a Mexican grant, it has no difficulty in finding and using apt language to express the intent clearly and explicitly; and with these former acts before that body it can hardly be supposed that congress would have failed to use appropriate words to exclude this class of lands in the railroad grants, had such been the design. As their lands are not in terms excepted, it must be held that congress did not intend to exclude them from the operation of the grant. I have mentioned the only acts relied on, and they are the only ones I have found from which a statutory reservation can be deduced, independent of any specific order by some officer of competent authority reserving the lands. It is not pretended that there is found any express reservation in either or all of these acts; and to my mind none can be implied by any reasonable construction.

Besides, I find nothing in the policy of the grant that would justify any such strained construction or implication. The policy of the act was to give to the railroad company every alternate section of the public domain within ten miles on each side of the road, to which no private right had attached, and not already appropriated to some specific public use, to aid in the construction of this great public improvement. The donation was designed to be, and was, liberal. If reservations of this kind could be worked out by shadowy implications, in extended sections of the country, there would be no land granted, and no aid thereby conferred. This grant is to receive a reasonable construction, in view of the public object to be accomplished; and so construing it, it is obvious that the act granted everything within the general descriptions not taken out by specific enumeration. And the lands in question are, in my judgment, clearly not within the meaning of any one of the classes enumerated. The railroad act does not define its exceptions by reference to the pre-emption laws as a test. It names specifically each class intended to be excluded, and each has a subject-matter upon which it can clearly operate, without embracing lands of the class in question. I am satisfied that the lands in question are within the grant to the Central Pacific Railroad Company.