UNITED STATES *v.* McLAUGHLIN and others. (Seven Cases.)

*(Circuit Court, N. D. California. December 13, 1886.)*

1. PUBLIC LANDS — CENTRAL PACIFIC RAILROAD GRANT — MAP OF GENERAL ROUTE.

     The map of the route of the Western division of the Central Pacific Railroad, filed with the secretary of the interior, December 8, 1864, is the map of the general route, and not of the line as "definitely fixed," within the meaning of the land-grant act of 1862.

2. SAME—DEFINITE LOCATION.

     The map of the route of said road, as finally located and constructed, filed with the secretary of the interior, February 1, 1870, and accepted as such by that officer, is the map of definite location.

3. SAME.

     The Moquelamos grant was finally rejected, February 13, 1865, after which the lands within the exterior boundaries of the grant ceased to be *sub judice,* and became public lands, to the odd sections of which, within 20 miles of the line of the road, the right of the railroad company attached, and became indefeasible, immediately upon the filing of the map of definite location of the road, and the acceptance thereof as such by the secretary of the interior.

4. SAME—ESTOPPEL.

     Matters of estoppel as to lands lying east of range line, between ranges 7 and 8 E., Mt. Diablo meridian, discussed.

5. SAME.

     The withdrawal of the lands upon filing the map of the general route of the road, for 25 miles on each side of the line indicated, protected the lands against the attaching of any other right as against the railroad company, until the filing of the map of definite location.

*(Syllabus by the Court.)*

In Equity.
*S. G. Hilborn*, U. S. Atty., for the United States.
*Mich. Mullany* and *D. M. Delmas*, for complainants.
*A. L. Rhodes*, for McLaughlin.
*F. H. Smith* and *L. W. Elliott*, for certain defendants.
Before SAWYER, circuit judge, and SABIN, district judge.

SAWYER, J., (SABIN, J., *concurring.*)    This, and the six other suits, are brought by the United States against the Central Pacific Railroad Company, as patentee, and its various grantees, now holding the title, to vacate seven different patents, embracing, in the aggregate, many thousand acres of land, as having been, improperly, issued by mistake. They are the same patents sought to be vacated in *U. S.* v. *Central Pacific R. Co.*, 8 Sawy. 81, 11 Fed. Rep. 449, in which the bill was dismissed, without deciding the case upon the merits, for want of indispensable parties; as no one having, at the time, any interest in the lands, was made a party to the suit.    In the present case, the Central Pacific Railroad Company, not having any interest, is a mere nominal party, and the case must depend upon the rights of the other defendants, who derive title through the patentee.

The patents purport to have been issued in pursuance of the act of July 1, 1862, to aid in the construction of a railroad and telegraph line across the continent, (12 St. 489, and amendatory acts,) under which the Central and Western Pacific roads were constructed.    A portion of the lands in question, are admitted to be within the exterior boundaries of the lands claimed under the fraudulent Moquelamos grant, which was finally rejected by the supreme court of the United States, on February 13, 1865.    Until the final rejection of said grant on February 13, 1865, the lands, so admitted to be within the boundaries of the alleged grant, were held by the supreme court, in *Newhall* v. *Sanger*, 92 U. S., 761, to be *sub judice*, and therefore not public lands, and not to be within the terms of any grant, that attached prior to the final rejection of that grant, and that decision is controlling, provided the facts are, as they were supposed to be, in that case.    *Newhall* v. *Sanger* was not a suit between the parties to the railroad grant, and it was decided upon demurrer.    The facts seem to have been imperfectly known to the parties, and the allegations of the bill upon which the case turned, were extremely loose. The grant is to the alternate sections on "each side of said road, not sold, reserved or otherwise disposed of by the United States, and, to which a pre-emption, or homestead claim may not have attached, *at the time the line of said road is definitely fixed.*"    If the line of said road was "definitely fixed," before February 13, 1865, then, unless there were other controlling equities, under the decision in *Newhall* v. *Sanger*, the lands which were, then, *sub judice* within the bounds of the Moquelamos grant did not pass to the railroad company, and ought not to have been patented. But, on the contrary, if the line of said road was *not "definitely fixed,"* within the meaning of the act, till after February 13, 1865, then, it is conceded, that they had ceased to be *sub judice*, and they did pass to the

railroad company, and were properly patented. The bill alleges that the line was "definitely fixed" on December 8, 1864. The sworn answer responsive to the bill, denies this allegation, and alleges that the line was not definitely fixed till February 1, 1870, or, at least, till 1868, and the burden of showing affirmatively a definite location at an earlier date is on complainants. The complainants contend, and claim to have introduced evidence establishing this position—that the line of the road was "definitely fixed" on December 8, 1864—the time alleged in the bill, by the filing of a certain map in the office of the secretary of the interior, at Washington, a copy of which is in evidence as Exhibit A. While the defendants, on the contrary, contend that this is not a map definitely fixing the line of the road, but is only the map required by section 7 of the act, to be filed in the department of the interior to "designate the *general* route of said road, as near as may be;" and that the line of said road was not "definitely fixed," till the filing of the map of the road as actually located and constructed on February 1, 1870, a copy of which is in evidence as Exhibit 17; or, at least, until the road was actually located in 1868, where it is, in fact, built, both of which periods are long since the final rejection of the Moquelamos grant. And this is the only disputed issue between the parties on this branch of the case. Upon the determination of this issue, therefore, depends the decision of this case, unless there are other equities disclosed, upon which defendants can rest, as to all, or some of the lands.

The letter of Leland Stanford, president of the Central Pacific Railroad Company, to the secretary of the interior, dated February 20, 1864, referring to a prior "*general* map," filed on June 1, 1863, and saying that since that time the first *fifty miles* of the road had been *finally located*, of which location he sends a map, showing the definite location, manifestly relates to the Central Pacific Railroad proper, extending east from Sacramento over the mountains. At that time the company had been vigorously at work on that line, but had done nothing on the Western division. This relation to that part of the road appears in the letter itself, from the subsequent passage asking surveys to be made, and saying: "The company will have thirty-one miles of their road, *from Sacramento to Newcastle Gap*, completed and running about the first of April next." Besides, no map of the kind is put in evidence. This letter, evidently, has no bearing on the question at issue.

The first evidence relating to a location of the Western division is a map put in evidence by complainants, and upon which they rely, as showing the time when the line of the road became "definitely fixed." It is attested October 5, 1865, by the president, secretary and acting chief engineer of the company, and was filed in the general land-office at Washington, having been deposited with the secretary of the interior, and transmitted to the commissioner of the land-office by the secretary, December 8, 1864. It has on its face the following: "Map of the Line of the Western Division of the Central Pacific Railroad Company of California, from Sacramento to San Francisco." It has also upon it the following:

"*United States of America, State of California.*

"OFFICE OF THE CENTRAL PACIFIC RAILROAD COMPANY OF CALIFORNIA.

"We, the undersigned, the president, secretary, and acting chief engineer of said company, do hereby certify that this is a true and complete map of the line of said company's road and telegraph line, from the city of Sacramento to the city of said San Francisco, and the western terminus thereof, as adopted, located, designated, and fixed by the *board of directors of said company, a copy* of which is on file in the office of said company in the city of Sacramento.

"Witness our hands, and the corporate seal of said company hereto affixed by order of said board of directors, this fifth (5th) day of October, A. D. 1867.

| Central Pacific Railroad Co., SEAL, of California. | "LELAND STANFORD, President.<br>"E. H. MILLER, JR., Secretary.<br>"SAM'L S. MONTAGUE, Acting Chief Engineer." |
| --- | --- |

But this map, thus indorsed, was accompanied by a copy of the resolution of the board of directors, referred to, in pursuance of which the map was sent, and explanatory of its purpose. Both were sent together, as one act, and filed in the office of the secretary of the interior, and must be considered together, the one as explanatory of the other. In this resolution, after a long preamble and recital, "it is hereby ordered and resolved, by the board of directors of the said 'Central Pacific Railroad Company of California,' that the *general route of the Western division* from Sacramento to San Francisco of the railroad and telegraph line of said company, is hereby extended, located, fixed and designated, as laid down and surveyed from the city of Sacramento through said county and the counties of San Joaquin, Alameda, Santa Clara, San Mateo, and the city and county of San Francisco, to a point sixty-six feet west of the west line of Third street on Brannan street, in the city of San Francisco, which point is hereby fixed and established as the western or Pacific coast terminus of said railroad," etc. "*    *    *   And *which said line or route also appears, by reference to a map of the same, duly certified by the president and secretary* of this company, under the corporate seal of this company, *to be filed in the office of the secretary of the interior of the United States, under and in pursuance of the said acts of congress*, which map is marked and designated as follows: 'Map of the line of Western division of the Central Pacific Railroad Company of California, from Sacramento to San Francisco.'"

This was adopted October 4, 1864, and a copy, certified by the secretary, sent with the map, put in evidence, and relied on; and it formed a part of the communication to the secretary, indicating the object of filing. It will be seen, that the certificate of the president and secretary indorsed on the map, does not say that it is a map of "the line of the road as definitely fixed," nor taken in the strongest view, in favor of complainants, is it inconsistent with the idea that it is only the map to "designate the general route of said road, as near as may be" required by the act. While the resolution *ex industria,* says that it is "*the general route* of the Western division, from Sacramento to San Francisco," and further on, declares, which *said* line or *route*, also appears by reference to a map of the same, duly certified by the president and sec-

retary of this company, under the corporate seal of this company, to be filed in the office of the secretary of the interior of the United States, *under and in pursuance of the said acts of congress*," etc. If the certificate can possibly, by itself, be deemed equivocal, this resolution shows, distinctly, the purpose of the map, and it also limits the extent of the authority of the officers to certify. It is called the "*general route*," and it is expressly declared to have been prepared and filed "under and in pursuance of the said act of congress." And the act nowhere, in terms, or by necessary implication, requires any map to be filed other than the map to "designate the *general* route of said road as near as may be." It was filed within "the time for designating the *general route* of said railroad, and of filing a *map of the same*," as extended by the act of 1864, (13 St. 358, § 5.) It was not filed for the purpose of procuring patents, as no part of the road had, then, been constructed, or even commenced; but for the purpose of procuring a withdrawal, by the secretary of the interior, of the 25 miles of the "designated road or routes * * * from pre-emption, private entry and sale," as provided by section 7 of the act of 1862. This would protect the rights of the company till the "line could be definitely fixed," when the grant would at once attach to the lands within 20 miles, by that act. There could be no object in fixing the definite location at that time, as the rights of the company were equally protected by the withdrawal of a wider limit, while a definite fixing of the location, at that time, could only be a disadvantage, and embarrassment, when they should come to the practical construction of the road.

Upon a consideration of the certificate on the map, in connection with the resolution and act requiring a designation of the general route, the purpose of the designation, and the condition of things at the time, it seems, indisputable, that this map was intended to be, and was, only the map designating the "*general route* of said road," provided for in section 7. The secretary of the interior, and commissioner of the general land-office, as they could not well have otherwise, done, so understood it, and then, and ever afterwards, till after the issue of the patents in question, acted upon that hypothesis. Thus, in a letter dated "DEPARTMENT OF THE INTERIOR, GENERAL LAND-OFFICE, December 23, 1864," addressed to the register and receiver of the land-office, at San Francisco, California, accompanying a copy of this map, J. M. Edmunds, commissioner of the general land-office, says:

"I inclose herewith a *map of* the *general route* of the Western division of the Central Pacific Railroad *within your district*. The line of railroad from Sacramento to San Francisco by way of Stockton and San Jose, and the limits of the same, are indicated on the map by red color."

He then indicates the limits of the district, so as to show what part of this "general route" was within the district. The commissioner proceeds:

"Upon the receipt of this letter, you will withdraw from sale, location, pre-emption and homestead, the vacant odd-numbered sections and parts of sections, within *twenty-five* miles on each side of said road, as indicated by the diagram herewith."

Other instructions are given to further the object.    At about the same time the commissioner sent a map of that part of the route lying within the Stockton district, with the *twenty-five* mile limit, within which the withdrawal was ordered, laid down by a purple line.    The character of the map is designated on the copy of the map itself, as follows: "*Approximate Limits* of Central Pacific R. R. in the Stockton District.    (From map dated October 5, 1865.)"

This map was received at, and filed in the Stockton land-office, on January 31, 1865, at 11 o'clock A. M., and the order of withdrawal immediately made on that day, as directed.    Thus, the department of the interior, and the general land-officers, did not suppose for a moment that this map of December 5, 1864, was anything other than a map designating "the *general route*" of the road, and the "approximate" location of the line; and they acted accordingly.    If this had shown the location of the road, as "definitely fixed," there was no authority for withdrawing the lands within the 25-mile limit; and there would have been no occasion for such withdrawal; for, upon the definitely fixing of the location, and the filing of a map thereof, the grant attached, at once, *ipso facto,* to all the odd sections within the 20-mile limit, and no withdrawal was needed, and the grant could not, afterwards, be extended beyond that limit; and no reservation beyond was longer required, or authorized.

Again, as late as July 17, 1866, J. M. Edmunds, commissioner of the general land-office, addressed a letter to the register and receiver of the land-office at Marysville, in the district in which a portion of the route was situated, in which he says:

"In reply to your letter of May 26th, submitting a schedule, or list of lands recommended to be offered at public sale, I would state, that a considerable portion of the lands, so recommended, are within the *twenty-five mile* limits of the Western division of the Central Pacific Railroad.    Until the route of the said road is 'finally located,' as provided in section 7 of the act of congress, approved July 1, 1862, this office cannot undertake to determine the *twenty*-mile limits to which the road will be restricted, and, consequently, cannot include for proclamation lands concerning which there is a question as to whether they should be offered at a minimum of $2.50 per acre, or at a minimum of $1.25 per acre.    On the seventh of December, 1864, a map showing the designated and *general route* of the Western division of the Central Pacific R. R., from the city of Sacramento to the city of San Francisco, was filed with the secretary of the interior.    A year and a half has elapsed, and *no definite location has been fixed by the railroad company.*    [And this was a fact, as the final location had not been made.]    This office is in receipt of letters from settlers residing within the reservation, who, believing that they are outside of the *twenty*-mile limits, feel themselves aggrieved, that they are not permitted to pay for portions of the even-numbered sections at $1.25 per acre, or to enter the odd-numbered sections at the same price.    You will ascertain who are the officers of the above-named railroad company, and by furnishing a copy of this letter, you will notify them that they are required by this office to file a definite and 'final location' of the route of their road, to the end that the interests of the government and of the settlers may be no longer prejudiced.    If such map or plat of the 'final location' of the route shall not be filed within a reasonable time, this office will regard the present map on file here as the 'final location' of the road, and lay down the twenty-mile limits in accordance therewith."

Where the authority for such a course of proceeding, as suggested, is found, is not apparent, as the company proceeded as rapidly as the statute required. But the threat was not put in execution.

The next action on this point, so far as the testimony discloses, was the filing by the company of a map "definitely fixing" the route on February 1, 1870. This map is designated on its face: "Map of the Western Pacific Railroad, Showing its Connection with the U. S. Land Surveys. Scale, two Miles to Inch."

It has, also, on its face the following certificate made and verified by the oath of its chief engineer:

"ENGINEER'S OFFICE, W. P. R. R., SACRAMENTO, January 3, 1870.

"I, S. S. Montague, chief engineer of the Western Pacific Railroad Company, hereby certify that this map is a correct delineation of the line of the Western Pacific Railroad Company *as located* and *constructed* between the city of San Jose and the point of junction with the Central Pacific Railroad near Sacramento, and that the *connections of the said railroad line with the line of the U. S. land surveys are correctly shown thereon.*

"SAMUEL S. MONTAGUE,
"Chief Engineer Western Pacific R. R. Co."

"Sworn to and subscribed before me, W. B. C. Brown, county clerk of Sacramento county, California, and *ex officio* clerk of the Sixth district court, the same being a court of record, this third day of January, 1870.

"As witness my hand and the seal of said court.

"W. B. C. BROWN,
[Seal.]            "County Clerk and *ex officio* Clerk of said Court."

Written on the face in the department: "Western Pacific R. R. *as located and constructed* from San Jose to Sacramento, Cal." Also, "Filed in the general land-office February 1, 1870. See letter from secretary of interior, dated February 1, '70.   II, 89, 655." This is the only map on which it is certified that the line of the route is correctly connected with the public survey—an important consideration with reference to ascertaining the lands to which the grant attached.

This map having been filed in the office of the secretary of the interior, the secretary, on February 1, 1870, transmitted it to the commissioner of the general land-office, accompanied by a letter, of which the following is a copy:

"DEPARTMENT OF THE INTERIOR, WASHINGTON, D. C., February 1, 1870.

"SIR: I transmit herewith a map of the location of Western Pacific Railroad of California, between San Jose and the point of junction with the Central Pacific Railroad, near Sacramento. *This map is accepted, and will become the basis for the adjustment of the land grant.* The order of twenty-second March last, directing the issue of patents to the company to be suspended, is *hereby revoked.*

"Very respectfully, your obedient servant,    J. D. Cox, Secretary.

"*Hon. Jos. S. Wilson, Commissioner of the General Land-office.*"

Acting upon the communication from the secretary of the interior, the commissioner of the general land-office, Hon. Joseph S. Wilson, on May 6, 1870, addressed a letter of instructions to the register and receiver of the Marysville land-office, in which he says:

"The Western Pacific Railroad Company having filed a map of definite location of their line of route, I herewith transmit a diagram of said line, with the 20-mile limits of the land grant within your district, and *you will be governed by this limit in the adjustment of the grant.* All the lands, heretofore withdrawn on account of the grant, and now falling *outside of the limits designated* on the accompanying diagram, will be restored to the public domain, and where heretofore offered, will be subject to pre-emption, homestead and private entry, after due public notice. Where, however, they have *not been offered,* the restoration will be to pre-emption and homestead entry only."

Thus the map of February 1, 1870, was expressly and formally accepted by the secretary of the interior, as the map by which the "line of said route is definitely fixed."

All the parties, the company, the secretary of the interior, and the commissioner of the general land-office, at all times from the beginning, till after all the patents in question were issued, acted upon the hypothesis that, the map filed December 8, 1864, was only the map designating "the general route, as near as may be," and not a map by which the line of the road was "definitely fixed." And this action is in strict conformity with the facts, and with the acts, and proceedings as they actually occurred, in the final location, and construction of the road. The road is, actually, located and constructed, upon the line as laid down on the map of February 1, 1870, and not otherwise. It is not, in fact, located or constructed between Sacramento and Stockton—the portion now in question—upon the line laid down on the map of December 8, 1864, and it does not, at any one point, touch or cross that line, nor for the whole distance of about 50 miles does the road, as definitely located and constructed, approach it at the nearest point within about a mile. The line, as located, is from one to more than five miles to the east of the line of the general route; the nearest point being at Stockton, where the road makes a sudden turn upon a near approach to that city, and approaches the line on this general map. The road for the greater part of the distance between Sacramento, and Stockton, is finally located and constructed, on a line from four to five miles east of the line, as laid down on the general map of December 8, 1864; and at all points within the bounds of the fraudulent Moquelamos grant, it is from two to five and a half miles to the eastward—the nearest point of approach, within those bounds, being not far from two miles. And according to the uncontradicted testimony of Mr. Stangroom, the chief engineer, the final survey and location was not, in fact, made till after June, 1867. The construction was commenced on the southern and western end, at San Jose, and built northward and eastward; the first section of 20 miles having been completed in September, 1866. It does not appear that any work was done on the northern and eastern end between Sacramento and Stockton until 1869, when the first 20 miles from its intersection with the Central Pacific, near Sacramento, towards Stockton, was completed early in 1869, and the rest was completed and in operation, carrying passengers and freight, by June 9, 1869. Section 7 as well as section 3 of the act of 1862, recognizes in express terms the distinction between the designation of "the general route of said road" upon a map to be filed in the depart-

ment of the interior, and the time, "when *any portion* of said route *shall be finally located*," at each of which periods different acts are to be performed by the government. There is nothing in the act that in terms, or by necessary implication, requires the filing of a map of the route as "finally located," nor that prescribes the time wherein the route shall be finally located. It does not contemplate that the road shall all be finally located at the same time. On the contrary, the passage in section 7, "when *any portion* of said route shall be finally located," shows that it was not expected that the final location would all be made at once, but in parts, or "portions," as is the universal custom in railroad building. The company was not called upon by the statute, to make its final locations any faster than the exigencies of construction should require. Doubtless, it was supposed by congress, that, as the road should be constructed in sections of 20 miles each, advantageous changes in the location might be developed.

The road was finally located, in fact, and fully constructed, and in operation within the time allowed by the act of congress, (13 St. 504, § 2.) The act called for withdrawal of the odd alternate sections from other disposition, within *twenty-five*, instead of *twenty* miles, for the very purpose of permitting a change in the location, to any point within that range that might be found necessary, or advisable, without prejudicing the right to the lands within twenty miles of the line, as it should be actually, finally, located and constructed. After filing the map of general location, and the withdrawal in pursuance thereof, no other right could be initiated under the law, whereby the company could be prejudiced as to any lands, that should fall within the line, as finally located within the 25-mile limit. *Its rights were as secure against the attaching of other rights, under the withdrawal, as under the definite location.* Upon the final and definite location, the right, at once, attached to all the specific odd-numbered sections within 20 miles of the line, and within the 25-mile limit, and all lands outside the 20-mile limit thereby became released. This distinction is clearly stated in *Kansas Pac. R. Co.* v. *Dunmeyer*, 113 U. S. 636, 5 Sup. Ct. Rep. 566.

Although there is no specific requirement made upon the company, in the act, to file in the office of the secretary of the interior a map of the definite location, yet, in this case, also in *Van Wyck* v. *Knevals*, 106 U. S. 366, 1 Sup. Ct. Rep. 336, and in *Walden* v. *Knevals*, 114 U. S. 374, 5 Sup. Ct. Rep. 898, it is held that the filing of the map of definite location is the time when the grant attaches itself to the *specific* lands, and until that time the line can be changed. In the latter case the court says:

"In the case mentioned we held that the route must be considered as 'definitely fixed,' when it had ceased to be the subject of change at the volition of the company: that until the map designating the route of the road was filed with the secretary of the interior, the company was at liberty to adopt such a route as it might deem best, after an examination of the ground had disclosed the advantages of different routes. But it was held that when the route was adopted by the company, and a map designating it was filed with the secretary of the interior, *and accepted by that officer*, the route was established. In the

language of the act, it was 'definitely fixed,' and could not be the subject of further change, so as to affect the grant, except by legislative consent; and that no further action was required on the part of the company to establish the route."

Now, in this case, the map of December 8, 1864, as we know, has not been regarded by either the company, or treated by the department, as anything but the map of the "general route of said road," and no map of the definite location was filed, or accepted, as the definite final location till February 1, 1870, which map corresponds with the road *as actually located and constructed*, and, in the language of the supreme court just cited, was in fact formally and expressly "*accepted by that officer*"—the secretary of the interior—as the definite and established location of the route. While the map of December 8, 1864, does not lay down the line upon which the road was constructed, and it was never accepted or acted upon by the department, as the map of the definite location.

In our judgment, the map of February 1, 1870, is the one definitely fixing the location, within the rule as laid down in the cases cited, which are controlling, and that the route was not definitely fixed at the time of the filing of the map of December 8, 1864, nor till long after February 13, 1865, the date of the final rejection of the alleged Moquelamos grant, and that at the time the road became definitely fixed, the lands had ceased to be *sub judice*, and become public lands to which the grant attached.

Because the Western Pacific Railroad Company, the assignee of the Central Pacific Company, made claim to have the lands patented which lie opposite the first section of twenty miles from San Jose, completed in September, 1866, and patents were issued along that section of *twenty* miles, before the filing of the map of February 1, 1870, it is contended that the map of December 8, 1864, must have been regarded as the map of definite location. But this by no means follows. Those selections were all certified by the chief engineer, under oath, to be within the *twenty* miles of the line, as located and actually constructed, and this was verified by the certificate of the proper officers of the land-office. The proofs of construction were submitted to, and the work inspected by, the government commissioners, and reported to the president as having been completed pursuant to the statute, and the road, as so located and constructed, was accepted by the president, and the patents issued accordingly. The president must, necessarily, have had some map, or other satisfactory evidence, as to the location of the completed work.

When the road along that section was actually constructed *and accepted*, its line, to that extent, *was, of course, in fact "definitely fixed,"* and the parties were entitled upon showing these facts, in the proper mode, to the specific odd sections within 20 miles of the line, and all, patented, were within that distance. The department satisfied itself from the evidence submitted, that the lands were within the limits of the line, actually constructed, and was satisfied with the showing made. It may be, that for his own satisfaction, the secretary of the interior might have required—as the supreme court indicate that he might—the filing of a separate and distinct map of definite location; but in this instance, as

he well might be, the head of the department seems to have been satisfied without, and the patents issued, and are, doubtless, valid.

But, whether properly issued *at that time,* or not, cannot affect this case, as none of the patents involved in this suit were issued till after the map of definite location was actually filed, and actually, formally accepted, as such, on February 1, 1870, and all the lands covered by them are within the proper limits. As near as we can determine from an inspection of the two maps, the line of the road, as actually constructed, and laid down on the map of definite location of February 1, 1870, this 20-mile section of the road east of San Jose coincides throughout with the line as laid down on the general map of the route of December 8, 1864. There does not appear to have been any change on this section. After selection and application for patents, as we have seen, the issue of the patent, in some instances, on the portion of the road now in question, was suspended until the map of definite location was filed and formally accepted by the secretary of the interior. Upon the filing of the map, the order of suspension was, at once, revoked.

The selection and patenting of the lands of the Central Pacific Railroad proper, east of Sacramento, for similar reasons, are irrelevant, and do not affect the question. So, also, the fact that copies of the map of December 8, 1864, were filed in the office of the secretary of state, and the offices of the county recorders of the several counties through which the road passes, in pursuance of the requirement of the *state* statute, is irrelevant and does not affect the question at issue. They were, doubtless, sufficient for the purposes of the state laws, but, whether they were, or not, makes no difference, so far as the questions now involved are concerned. For the purposes of this case, we are governed solely by the statutes of the *United States* upon the subject. If the company proceeded in accordance with those statutes, its rights vested in accordance with their provisions, and became irrevocable.

Aside from the strictly legal aspect of the rights of the parties, in our judgment, the equities of the case, imperatively, demand, that the court should treat this question, as to when the road was definitely located in the same manner as it was treated by the executive branch of the government, and by the parties, till after the issue of these patents; and hold that the map of February 1, 1870, and not the map of December 8, 1864, is the map that definitely fixed the location of the road. All these patents, except one, which embraces but a small amount of land, were issued, and the present holders or their immediate grantors, other than, and holding under, the railroad company, acquired their title prior to the decision in *Newhall* v. *Sanger* in May, 1876, up to which time, all departments of the government, including the national courts of the district, and the supreme court of California, held these lands to be within the grant, and to have passed by it to the company. *Sanger* v. *Sargent,* 8 Sawy. 93, (decided in 1874;) *Central Pac. R. Co.* v. *Yolland',* 49 Cal. 439; *Same* v. *Robinson,* Id. 446; *Kaiser* v. *McLaughlin,* Id. 449.

Under such circumstances, these parties—the present holders of the title—may well be held to have acted in good faith, and to have inno-

cently parted with the consideration paid for the lands purchased, even though it turned out, that they were mistaken, as to the proper construction of a statute, which, it must be admitted was, at best, doubtful, since it was up to that time upheld by the courts, state and national, *and only at last overruled by a divided court.*

It will be seen, also, from the letter of Commissioner Edmunds, of July 17, 1866, already quoted, that the government sold the even sections within the grant, "at a minimum of $2.50 per acre," as in all cases of grants of the odd sections to railroads. In this way, by giving these odd sections, as a consideration for building a road, and selling the even sections for double the minimum price, the government loses nothing. It gets the full price for all its lands just the same as if it had not granted the odd sections; and the advantages of the construction of the railroad in carrying the government mails, and freights; in developing the resources of the country, and in numerous collateral ways besides. The government, it appears, has received all these benefits. Both the purpose of withholding the lands claimed under Mexican grants from the railroad grant, and all the objects sought as a consideration of the railroad grant, have been fully accomplished. If, under the terms of the act, the odd sections were not granted, then, for the same reason, the price of the even sections should not have been doubled. The government had on this theory, all its lands to sell at the ordinary price, and there was no authority to sell for more. Having sold the even sections at double price, under such circumstances, is there any principle of equity jurisprudence, that can now, possibly, justify the government in calling upon a court of equity to vacate the patents, and titles of, really and in fact, innocent purchasers to the odd sections in order that it may sell them, also, at double prices, and in addition to the advantages of getting the contemplated road, sell all its lands within 20 miles of the line at twice as much as is asked, or authorized in all other cases? And this without authority of law; for the right to sell the even sections at double prices depended upon the fact, that the odd sections had been granted. Cognate questions are discussed in *U. S.* v. *Central Pac. R. Co.,* 26 Fed. Rep. 479, which see.

Thus, it appears, that the company, the executive branch of the government, the local judiciary, and the grantees of the patentees of these lands, honestly acted upon the idea, that congress intended that this road should be *lawfully* built; that the railroad got a right of way, etc., over the lands that were public, in fact, however they may be considered in law by construction, under the provisions of the second section of the act, and to the odd sections, granted by the language of the third section, identical with that in the second. It, therefore, appears to us, whatever views others may take, that the equities of the case, under the conditions set out, and the facts, as they appear in the case, as well as the legal rights of the parties, imperatively require that the map of February 1, 1870, and not the map of December 8, 1864, should be held and finally established to be the map of definite location; and, if the map of February 1, 1870, be not the map of definite location, then, that

the route was not, definitely fixed, until it was, in fact, actually located in 1867–68, on the line where it was afterwards, in fact, constructed; or else, till the route and the completion of the road were approved by the president; and either of these periods was subsequent to February 13, 1865, and sufficient to render these patents valid at law.

There are other facts and equities relied on by the defendants, as an independent defense, requiring, as they contend, a dismissal of the several bills as to all the lands in question, lying to the east of the range line, between ranges 7 and 8, or the "Jack Tone Road," as it has been called in the evidence for convenience. These facts are stated somewhat fully in *U. S.* v. *Central Pac. R. Co.*, 8 Sawy. 83, 11 Fed. Rep. 449, to which reference is made, and it is unnecessary to go over them at large now. It will be sufficient to state here, that the eastern boundary of the Moquelamos grant is one of the most vague and indefinite character to be found, and which no two men, left to themselves, would be likely to locate on the ground at the same place. There was no *diseno.* Its southern boundary was "the land of Mr. Gulnac," *not the Calaveras river.* There was a very accurate—an unusually accurate—*diseno* to Gulnac's grant, which is in evidence. At the time of the passage of the act making the railroad grant, the Gulnac grant had been finally located— and located very nearly in accordance with the *diseno* of the grant. In 1855 the section lines were run, and the plats of survey filed in the proper land-office for all lands lying east of range line between ranges 7 and 8, and ever, afterwards, all lands east of that line were treated by all departments of the government, from, and including, the president down, like all other surveyed public lands of the United States. This line was considerably east of any part of Gulnac's lands, as located or shown on the *diseno.* To the west of the line, between the Moquelamos river and Gulnac's land, there were about 90,000 acres of the best part of the land, out of which to satisfy the, about, 48,000 acres of the Moquelamos grant—or nearly double the amount required. There was much more than land enough to satisfy the grant actually bounded by Gulnac's land, and it would be necessary to locate it so as to be bounded by his land. The three lines were certain. the east one, only, uncertain. It was only necessary to go east far enough to get the quantity to locate the grant, had it been valid, and bounded by Gulnac's land.

It seems manifest, also, from the testimony, that Pico, and his agents and attorneys, acquiesced in this practical location of the eastern boundary of the lands, out of which his grant was to be satisfied. And this survey was expressly authorized by the statute for the purposes for which it was made. *U. S.* v. *Central Pac. R. Co.*, 8 Sawy. 88, 89, 11 Fed. Rep. 449.

The lands lying east of this line were offered for public sale on the proclamation of the president, some sold, and afterwards the unsold lands were thrown open to private entry, pre-emption, homestead entry, etc., and treated in all respects as public lands, until after the decision of the supreme court in *Newhall* v. *Sanger*, in May, 1876. Subsequently to that decision, and long after the patents in question were issued, when it be-

came desirable, as seems to have been supposed, in order to cut off the grant to the railroad company, and 14 years after February 13, 1865, when the lands ceased to be *sub judice*, in 1879, a survey of the extreme eastern exterior boundary of the rejected Moquelamos grant was ordered by the land department, in which the surveyor was directed to make the Calaveras river, easterly of the Gulnac grant, the southern boundary. The Calaveras river is not mentioned in the Moquelamos grant at all, nor is any southern boundary mentioned other than Gulnac's lands. This action resulted in the *ex parte* Bond survey of 1880, which located the exterior boundary several miles east of the range line between ranges 7 and 8. This survey did not carry the line sufficiently far east to satisfy the department, and in November, 1881, an order for another was made, which resulted in the Von Schmidt survey of 1882, which carried the line still further east. But this was, also, unsatisfactory, and set aside in 1882, and another recommended. Thus, including the survey of 1855, which was practically a survey of 'this line, by express authority of the statute, and was acted upon as such by the government, in ascertaining what lands were public, and as such open to sale and pre-emption, there were three surveys made on the ground by different men, all of experience in locating Mexican grants, and all differed in their location—the difference between some of them being several miles. Probably no two men, acting independently upon the ground, not knowing of the action of the others, and no two juries out of any number that might be impaneled trying the case, independently of each other, would locate this exterior boundary in the same place. The description of this boundary in the grant is an utterly impracticable one, for any other purpose, than locating a comparatively small tract of land within a much larger one.

It is, in part, on this ground of uncertainty, and utter impracticability, of locating, correctly, such a line, that this court has, repeatedly, held, that parties entering as pre-emption claimants, merely, without apparent title, upon these lands, since the patents issued, in suits by the holders under the patents to eject them, cannot attack the patent, collaterally, at law, upon these matters *dehors* the patent, and resting only in parol, in pursuance, as we suppose, of the rule established by the decisions of the supreme court in many cases. In such trials, no two juries could agree, as to where the eastern exterior boundary should be located. *Ehrhardt* v. *Hogaboom*, 115 U. S. 67, 5 Sup. Ct. Rep. 1157.

Without attempting to determine so uncertain and difficult a point, as to where the eastern exterior boundary of the Moquelamos grant should be located, as the claim is described in the petition before the land commissioners, it appears to us, under the facts in this case, the uniform acts of the government since 1855, and the acts and acquiescence of the claimants under the fraudulent grant, that the principles of equity require, those lands, if any there be, lying east of the range line, between ranges 7 and 8, within any admissible location of the eastern exterior boundary of the grant as described, to be regarded as emancipated, and discharged from that claim; or, at least, that in favor of these different

grantees of the patentee, the government should be held, in a court of equity, to be estopped from now alleging that they are within such boundaries.

If any lands east of the range line, between ranges 7 and 8, are, in fact, within the exterior boundaries of the Moquelamos grant, then, under the laws of the land, they were, clearly, not subject to pre-emption, homestead entry, sale, or other entry. The act extending the pre-emption laws to the public lands of California, in express, and the most explicit terms, excepts these lands from their operation—"*excepting,* also, the lands *claimed under any foreign grant or title,*"—is the language, (10 St. 246, § 6.) Yet, in pursuance of the acts of the government, ever since 1855, in treating the lands lying east of the range line, between ranges 7 and 8, as not being within the Moquelamos grant, and as being government lands, the records of the land-office show that, prior to February 13, 1865, of the lands lying east of said lines, and within what are now claimed to be the exterior boundaries of the Moquelamos grant, there were entered as state selections 10,000 acres; sold at public sale, on proclamation of the president, 400 acres; entered at private entry more than 3,000 acres; entered under the pre-emption laws more than 2,000 acres—making in the aggregate more than 15,400 acres, which have been patented upon said entries. Respondent's Exhibit 25. These entries were all made, if the present claim of complainants, as to the location of said eastern exterior boundary, is to be maintained, *by mistake, not only without any authority of law, but in direct violation of the express provisions of the statute.*

They stand in the same category, in this respect, with the lands now in question, except that the case is stronger against them, under the express, unmistakable terms of exception, than those involved in these suits. If the patents to the lands under the railroad grant are void or voidable, and must be canceled on the ground of mistake, etc., *a fortiori,* must these patents to lands so entered under pre-emption and other rights be void, and as such, canceled, whenever the United States shall see fit to file bills for the purpose. Why should not the United States, which have got their price once for all these lands in both cases, file their bill to vacate the patents thus issued by mistake to pre-emptioners and other purchasers, in order that they may sell them again, and put the money into the treasury, as well as is now sought to be done in the case of the lands in question? We can see no difference in principle, applicable to the two cases.

Do the principles of equity jurisprudence require, that these patents, in either case, under the peculiar circumstances surrounding them, should be decreed void and vacated? It does not appear so, to us. The interests of all *these* pre-emptioners and purchasers from the government, as well as of the parties holding under the railroad grants, and the interests of public justice, generally, require, that this practical location of the vague, uncertain, impracticable eastern exterior boundary of the Moquelamos grant of 1855, acted upon by all departments of the government, by the public and even by the claimant himself, for nearly a

quarter of a century, should not now be disturbed—that the government should be now estopped from alleging that it is, or should be, located elsewhere. That the law of estoppel, in a proper case, applies to the government, see *Clark* v. *U. S.*, 95 U. S. 539, 544; *Branson* v. *Wirth*, 17 Wall. 42; *State* v. *Milk*, 11 Fed. Rep. 389, 397, and cases cited.

But we rest our decision in this case, as to all the lands in question, upon the solid ground, as we think, that the definite location of the route of the road was made long after February 13, 1865, and for the purposes of this case, it makes no difference whether this location became definitely fixed in 1867–68, at the time it was actually finally surveyed on the line upon which it was afterwards, in fact, constructed; the time when the construction was completed in 1869; the time when the president adopted and approved the line and construction of the road; or the date of the filing of the map of actual definite location on February 1, 1870, and expressly accepted by the secretary of the interior as the map of definite location. The lands had ceased to be *sub judice*, and become public lands long before either of these dates.

Since this opinion was written, we have received copies of two important decisions bearing upon the questions involved in this case—one a decision of the supreme court of the United States in *Buttz* v. *Northern Pac. R. Co.*, 7 Sup. Ct. Rep. 100, rendered at the present term, which appears to us decisive as to the point upon which this decision is rested. It arose under the land grant to the Northern Pacific Railroad Company. Some time in the fall of 1871 the company commenced work on the section embracing the land in dispute in that case, and all that part of the road was graded and prepared for the superstructure. "In June following, the superstructure and the iron rails were laid, and that part of the road completed, and ever since the road has been maintained and operated." Apparently, after the grading was done, "on the twenty-first of February, 1872, the company filed in the office of the secretary of the interior, a map showing *that part* of the *general* route of the road." On March 30th, a description of the route was forwarded to the proper land-office, with an order to withdraw from pre-emption the lands within the designated limits; which, being received on April 20, 1872, the withdrawal was made. On May 26, 1873, nearly a year after the completion of the road, a map of the definite location of the road along this section of the route, was filed, and this map showed the line along this section of the road to be the same as that of the location made and graded in 1871, before the filing of the map of the general route, and as laid down on said map. The Indian title to the lands did not become finally extinguished till June 22, 1874, after the transaction set out had occurred. One Peronto, a person qualified to pre-empt public lands, settled on the land in dispute for the purpose of pre-empting, on October 5, 1871, some months before the filing of the first general map, and thereafter performed the required acts. It was held that the railroad company took the land; that until the Indian title was extinguished, no pre-emption or other right could be perfected or initiated; that this exemption from pre-emption protected the land, until the filing of the map of

the general route and withdrawal, after which the withdrawal protected it until the title was perfected by filing the map of definite location.

It will be seen, that, in this case, the location and grading preceded the filing of the general map, and that the final location shown by the map of definite location, filed after completing the road, coincided with the line shown on the general map, whereas, in the case before us, the road was not finally located, or constructed on the line indicated on the map of December 8, 1864. On these points the court says:

"When the general route of the road is thus fixed in good faith, and information thereof given to the land department, by filing the map thereof with the commissioner of the general land-office, or the secretary of the interior, the law withdraws from sale or pre-emption the odd sections to the extent of forty miles on each side. *The object of the law in this particular is plain. It is to preserve the land for the company to which, in aid of the construction of the road, it is granted.*"

And with reference to the Indian title, it observes:

"At that time the lands were subject to the Indian title. *The defendant could not, therefore, as already stated, have then initiated any pre-emption right by his settlement; and the law cut him off from any subsequent pre-emption.*"

It will, also, be seen that, in the case cited, the road upon the section in question was fully completed in June, 1872, while the map of *definite* location was not filed till May 26, 1873, about a year after the completion of the road; while in the case now before the court, the map of definite location, of February 1, 1870, was filed within about seven months after the completion of the road on that section which crosses the Moquelamos grant. *Thus, if the filing of the map of definite location was in time in the case cited, a fortiori, it was in time on the Western Pacific Railroad.* This case also recognizes the right to make the definite location in sections or parts—the location not being required to be made all at one time.

The other, is a decision of acting secretary of the interior, Muldrow, rendered in August last, in which he very carefully considers, in a well-reasoned opinion, the very question upon the records of the department, as to when the line of the Western Pacific Railway became definitely fixed, between Sacramento and San Jose, within the meaning of the statute. He holds, as we hold in this case, that the map of December 8, 1864, is the "*general,*" and *not* the map of *definite* location; that it was so treated by the government and the parties. But after discussing the point, as to whether the actual location in 1867–68, upon the line whereon the road was afterwards constructed on the section of the road involved; or the filing of the map of February 1, 1870; or the time of the acceptance of the road by the president, should be adopted as the time of the definite location, and finally adopts the latter point of time. *Rees* v. *Central Pac. R. Co.*, 6 Reporter, Wash. 1015.[1]

But in view of the case of *Buttz* v. *Northern Pac. R. Co.*, and of the

[1]NOTE. Since this decision was rendered, the telegraph announces that the decision of Acting Secretary Muldrow has been affirmed by the secretary of the interior.

*Dunmeyer* and other cases cited, we think the supreme court will finally hold that the map of February 1, 1870, is the map of definite location, and that the route became definitely fixed at the date of its filing. It fulfills all the conditions indicated in the *Dunmeyer* and other cases, while no other does. It professes to be, and was filed as, the map of definite location; it shows the lines as actually finally constructed, with its proper connections with the public surveys, while the prior map does not; it was actually, expressly "accepted by the secretary of the interior" as the map of definite location, and the land grant was, in fact, adjusted in accordance with the lines thereon delineated. But, it is sufficient for the purposes of this case, that the route was not definitely fixed by the map of December 8, 1864. All other possible points of time are subsequent to February 13, 1865.

The bills in this and the other six cases must be, respectively, dismissed, and it is so ordered.