WILLIAM E. ROGERS v. THE PORT HURON & LAKE MICHIGAN RAILROAD COMPANY AND HARSTON G. BARNUM.

*Railroad land-grants—Passage of title.*

Congress, by an Act passed June 3, 1856, granted certain lands to the State of Michigan to be used solely in aid of the construction of railroads. The State, by Act 126 of 1857, set them apart for the benefit of certain designated roads on condition that the beneficiaries should accept them subject to the terms of the Act. *Held*, in a case in which the acceptance was qualified, that the company acquired no title, and that a bill would not lie to quiet a title to the lands obtained by a levy of execution against the beneficiary intended by the Statute.

Common law rules cannot override statutes.

The State, while acting under the Constitution, can impose its own conditions on its own grants.

Railroad companies which accepted the congressional grant of public lands under the provisions of Act 126 of 1857, acquired rights which could not be destroyed except by their own neglect. ·

Appeal from Muskegon. Submitted January 19. Decided January 28.

BILL to quiet title.   Dismissal affirmed.

*E. R. Hutchins, Benton Hanchett* and *G. R. Lyon* for complainant.

*R. W. Boynton* for defendant Barnum.

CAMPBELL, J.   Complainant filed his bill to quiet title to certain lands claimed under an execution sale under a judgment rendered against the Detroit & Milwaukee Railway Company.   A tax title is also set up, but it is not important, because if the lands were not at the time the tax was assessed the property of the Detroit & Milwaukee Railway Company they were not taxable.   No dispute is made by counsel concerning the regularity of the execution sale, and therefore, for present purposes, it may be assumed to be valid, although, for the reason mentioned, we have not examined into it.

If the property belonged to the railway company, it was because it devolved upon the corporation under act No. 126 of the Laws of 1857 (Laws 1857, p. 346) disposing of the congressional land grant to Michigan in aid of railroads. The facts, therefore, require to be referred to somewhat specially.

The Detroit & Milwaukee Railway Company was a chartered corporation, and not organized under general laws. Its railway extended from Detroit through Owosso, and was to terminate at Grand Haven.   It was, at the time of the state law of 1857, finished some distance west of Owosso, and it was in 1858 or 1859 completed to Grand Haven.   It was under mortgages by the foreclosure of which the road and appurtenances passed in 1860 to another company.

In 1856, Congress passed a law whereby there was granted to the State of Michigan, conditionally, the right to appropriate alternate sections within a certain distance from the lines of certain railroads projected between given points, with a right to select other lands within a broader range to make up deficiencies caused by private rights or government appropriations.   Among the roads to be built were men-

tioned roads from Grand Haven and Pere Marquette to Flint, and thence to Port Huron. U. S. Laws 1855–6, pp. 19, 20.

The Act of Congress in giving this privilege to the State made the lands subject to disposal by the legislature " for the purpose aforesaid, and no other." These purposes were that the lands should " be exclusively applied to the construction of that road for and on account of which such lands are hereby granted, and shall be disposed of only as the work progresses, and the same shall be applied to no other purpose whatsoever."

The law further enacted that the lands " shall be disposed of by said State only in manner following, that is to say : That a quantity of land not exceeding 120 sections, for each of said roads, and included within a continuous length of twenty miles of each of said roads, may be sold ; and when the Governor of the State shall certify to the Secretary of the Interior that any twenty continuous miles of any of said roads is completed, then another quantity of land hereby granted, not to exceed 120 sections for each of said roads having twenty continuous miles completed as aforesaid, and included within a continuous length of twenty miles of each of said roads may be sold ; and so from time to time until said roads are completed ; and if any of said roads are not completed within ten years, no further sales shall be made, and the lands unsold shall revert to the United States."

Instead of selling the lands and using the proceeds, the State adopted the policy of allotting the lines to companies, and letting them have the lands as they earned them. In 1857 the statute first referred to was passed to take immediate effect from February 14th, and the principal questions in the case depend on the effect of this law, and action under it.

It will be perceived that the lands were so appropriated by Congress, that each twenty miles of road had set apart for it lands lying opposite to it so far as not already sold, and that in disposing of the lands they could not be sold except in portions of twenty miles in boundary. But the State could sell such a tract not exceeding 120 sections in the outset, but

thereafter was confined to such sales as twenty miles lengths of road were completed and certified by the Governor to the Secretary of the Interior. Provision was thus made whereby the United States authorities were to have constant knowledge of the progress of the work, and of the lands that remained and belonged to the government at the end of ten years, when the surplus was released from the appropriation.

The State law of 1857 (Laws 1857 p. 346) undertook to dispose of the land grants—as already suggested—not by selling the lands directly and building roads, but by setting them apart for the benefit of several railroads already projected or in process of construction. In doing this the original statute reserved from appropriation until the completion of the roads, a portion which the State itself could have used. While the Act of Congress contemplated that the State might act directly, yet the State Constitution stood in the way, and limited the power of the State in a manner which required attention in applying all of this legislation. By section 9 of article 14 of the Constitution it is ordained that "the State shall not be a party to or interested in any work of internal improvement, nor engaged in carrying on any such work, except in the expenditure of grants to the State of land or other property." The result of this restriction and of the Act of Congress, is that in dealing with this fund, the State—although having very broad discretionary powers —was nevertheless acting in some respects, as a trustee, and this trust relation is important in construing the action in dispute on this record.

The State by the act referred to accepted the congressional grant, and all the restrictions and the terms and conditions contained in the Act of Congress. It then proceeded to vest "fully and completely" in various railroad companies "so much of the aforesaid lands, franchises, rights, powers and privileges, as are or may be granted and conferred, in pursuance of said Act of Congress, to aid in the construction of" such of the roads as covered specified lines provided for in the grant. The lines from Grand Haven to Flint and from Flint to Port Huron, were divided at Owosso, the Detroit &

Milwaukee Railway Company taking the western division, and the Port Huron & Milwaukee Railway Company the eastern. The section making this apportionment contained at its close this important clause: "All and each of the several railroad companies mentioned in this section shall be subject to all the conditions, restrictions and obligations imposed upon them by this act, as hereinafter provided."

Most of these conditions are unimportant in determining the present cause, and may be passed over briefly. Those of more immediate moment will be referred to separately.

To provide for the completion of the work directions were given concerning the quality of the structures, the use of them in accordance with the conditions of the grant, the preparation of maps to fix the line of selection, and various specific restrictions belonging chiefly to State policy. Some of these as well as others became important, especially in connection with the fact that while the Detroit & Milwaukee Railway Company, and some others, were chartered companies, not subject to legislative discretion, most of the companies were organized under general laws, which could be changed without the consent of the companies.

By section 5 it was provided that "each and every one of said railroad companies is required, by a vote of a majority of the directors thereof, to accept the lands, franchises, rights, powers and privileges hereinbefore conferred, which acceptance shall be embodied in a written instrument, signed by the president, and attested by the secretary and corporate seal of said company; and in such acceptance, each of said companies shall severally assent and agree to the provisions and requirements of this act, which acceptance shall be filed in the office of the Secretary of State of Michigan, within sixty days after the passage of this act."

By section 8 a board of control was provided for, "whose duty it shall be to manage and dispose of such lands in aid of the construction of the aforesaid railroads, in the manner in this act provided, and to do any and all other acts necessary and proper respecting the construction and building of said railroads, which shall be prescribed by law." No subse-

quent legislation concerning this board is relevant here except the extension of its existence, which was at first limited, and the legislation of 1863 and 1865, which in continuing the board expressly ratified and confirmed all its official action theretofore had under the act of 1857. Laws 1863 p. 283 ; Laws 1865 p. 669.

Section 7 authorized each railroad company after the completion of twenty continuous miles, and after the Governor had certified to the Secretary of the Interior such completion, " then and not before " to sell sixty sections of land included in any continuous twenty miles, and so on until its entire completion and the acceptance of the same by the board of control herein provided, when and not before, it might sell the remainder.

Section 11 is as follows : " Should either of said railroad companies fail to accept said lands on the terms of this act, within sixty days, or fail to make the survey and maps by the first day of December next, or fail to construct its entire line of road or any part thereof, in the time and manner required, in such case said board of control shall have the power, and it is hereby made their duty, to declare said lands, so far as they have not been sold in good faith, forfeited to the State, and said board of control are hereby required to confer said lands upon some other competent party, under the general regulations and restrictions of this act."

Section 12 declares that " All of said railroad companies shall at all times and in all matters, be subject to the laws of this State, and to such rules and regulations as may from time to time be enacted and provided by the Legislature of the State of Michigan, in regard to the management and disposition of the said lands, not inconsistent with the provisions of this act, and the Act of Congress making said grant of land to this State, and they shall be entitled to all the immunities and privileges conferred by said laws : *Provided*, that nothing herein contained shall be so construed as to relinquish the right of the State to any specific tax imposed upon any railroad company within this State."

At this time the Detroit & Milwaukee Railway Company

was subject to a tax of one per cent. on its capital stock paid in, in lieu of all other taxes.

By section 20, a tax was levied of one per cent. on the cost of each road and of its equipments and appurtenances, and provision was made for an additional tax of not more than two per cent. on gross earnings, but the Detroit & Milwaukee and Port Huron & Milwaukee Railway Companies were to be allowed a diminution of the two per cent. tax in proportion to their diminished share of lands as compared with other companies. This was because these roads ran through a part of the State containing a smaller amount of unsold lands.

The Detroit & Milwaukee Railway Company on the 11th of April 1857, and within the 60 days specified, filed a document adopted by the directors and signed by the president and secretary under the corporate seal, accepting all of the act of 1857 except section 12, which was declared to be in contravention of its charter, and section 20, which provided for taxation. Against these there was also a protest, and distinct refusal of assent.

On the 26th of August, 1857, the Board of Control declared by resolution that the company had not in accordance with the statute accepted the grant and agreed to the provisions of the act, and had filed no such acceptance in the office of the Secretary of State; and thereupon declared the lands forfeited to, and revested in the State.

The directors of the company never thereafter made any other resolution of acceptance, and the company never applied to the Governor or the Board to accept their road as built in accordance with the act, and no certificate was ever filed on behalf of the corporation by the Governor with the Secretary of the Interior to that effect. There was never any corporate action thereafter asserting or claiming any rights under the grant.

The only claim by complainants that is supposed to make a difference is under certain amendatory acts of the legislature passed in 1859 and 1863, and the further claim that by the act of 1857 a title was vested in the railroad companies

in the shape of fee-simple only, forfeitable on condition subsequent, and that such forfeiture could only be declared judicially.

The law of 1859 contained two sections. The first purported to amend section 7 of the act of 1857, by changing "sixty" to "one hundred and twenty" as the number of sections to be earned by each twenty miles of road. The second section limited taxation to 1 per cent. on capital stock paid in.

There was nothing in this amendment which was designed to change any other part of the act of 1857. It did not repeal the section which required an assent to be filed in 60 days by the companies named in the act, and could only apply to companies that had, or should, become subject to its provisions. If designed—as it may have been in fact, although no court can so declare as matter of law—to conciliate particular companies, it could only do so as an inducement to future conduct, and not as a retrospective removal of disabilities. The Board of Control might perhaps find it easier to secure the building of some of the designated roads. But the Legislature could not and did not attempt to reach any company without a lawful acceptance by its directors and officers.

It is also to be noticed that this statute of 1859 did not change section 12 of the statute of 1857 which the Detroit & Milwaukee Railway Company had made their principal ground of refusal, as bringing the chartered rights of the company further under legislative control than they were willing to place them.

The law of 1863 (Laws 1863, p. 284) provided that such of the railroad companies mentioned in the act of 1857 as had finished twenty miles of road should have the full time allowed by the acts of Congress to finish their lines, and all forfeitures incurred by such companies under the laws of this State were thereby waived. Special provision was made for some particular roads.

The original act had declared forfeitures unless twenty miles should be finished in each year, and unless the whole

roads should be finished in seven years.   Roads in the Upper Peninsula, and some particular roads, were made subject to special provisions.   The Act of Congress gave ten years for completing the road, and made no provision for less than the whole, except that land was only earned in twenty-mile sections.

It is quite plain that the object of the act of 1863 was merely to aid such companies as had accepted the conditions of the act of 1857, but had delayed finishing their roads.

So far as the claim is concerned that these companies without acceptance obtained titles in fee, we think it has no legal basis.   We have held and we have no doubt that such companies as accepted the statute, obtained thereby rights which could not be destroyed except by their own neglect.   *Johnson v. Ballou* 28 Mich. 379; *Att'y Genl. v. Lake Superior Ship Canal Co.* 32 Mich. 233.

But the title of the State was itself subject to some conditions before a complete and absolute right could exist in any of these lands except the first 120 sections, and the State never transferred to any of the railroad companies the right to any lands not to be earned by building their roads.   Under the Act of Congress the State could not sell any of these lands until the Governor had certified to the Secretary of the Interior that the appropriate twenty miles had been completed.   While, therefore, the State could, as we have held in the cases cited, make such disposition in such manner as it saw fit of the lands granted, it could only be for the purposes and on the conditions prescribed by Congress.   These conditions are all distinctly embodied in the statute of 1857.   Not only did the State, as it was bound to do, impose these conditions, but it refused to allow any company to take the lands at all without a distinct and express act of acceptance.

This acceptance was the only act whereby any of these companies was brought into contract relations with the State at all.   The law did not assume to force the grant upon any company, and the contract could not bind either party until both assented to the same agreements and conditions.

There is no occasion to discuss the other questions raised

on a different theory.   It is enough for our present purposes to say that common-law rules cannot override statutes, and that the State, while acting within the Constitution, can impose its own conditions on its own grants.

We think no title vested in the Railway Company, and that the bill was properly dismissed.

The decree must be affirmed with costs.

MARSTON, C. J. and GRAVES, J. concurred.

COOLEY, J. did not sit in this case.