HOUGH v. BUCHANAN.

*(Circuit Court, N. D. Iowa, C. D. January, 1886.)*

PUBLIC LANDS—RAILROAD LAND GRANTS—SWAMP-LAND ACT—LACHES.
Where, under the act of congress, approved May 15, 1856, granting certain lands to the state of Iowa to aid in the construction of railroads, the lands were selected and claimed as indemnity lands by the state, and the United States had conveyed the title to the railroad company, which became a purchaser for value, such action on the part of the state defeats its right to subsequently claim the same lands under the swamp-land act of 1850; especially where no patent had been issued to the state under the swamp-land act, and where those claiming under said act had, during 25 years, done nothing to perfect the evidence of their title, or to assert any right to the land.

Equity. Bill to quiet title to certain realty.
*R. S. Ervin* and *Theo. Hawley,* for complainants.
*A. F. Call* and *Geo. E. Clarke,* for defendant.

SHIRAS, J. The bill in this cause is filed for the purpose of quieting in complainants the title to the N. E. ¼ of the N. W. ¼, and the N. W. ¼ of the S. E. ¼, and the N. E. ¼ of the N. W. ¼, of section 11, township 91, range 31 west, situated in Pocahontas county, Iowa. The complainants, who are the widow and heirs at law of John Hough, deceased, claim title under the act of congress approved May 15, 1856, granting certain lands to the state of Iowa to aid in the construction of several lines of railway proposed to be built in said state. The defendant claims the land under the act of congress approved September 28, 1850, and commonly known as the "Swamp-land Act."

The cause has been submitted upon an agreed statement of facts, documentary evidence, and oral testimony. In support of complainants' title the following facts appear: By the act of congress of 1856 there was granted to the state of Iowa, for the purpose of aiding in the construction of certain named lines of railroad, every alternate section of land designated by odd numbers, for six sections in width on each side of the proposed roads; and, to supply the deficiency in the quantity of lands caused by the fact that the United States had already sold or otherwise disposed of some parts of the odd sections within the six-section limit, it was provided that "it shall be lawful for any agent or agents, to be appointed by the governor of said state, to select, subject to the approval of the secretary of the interior, from the lands of the United States nearest to the tiers of sections above specified, so much land in alternate sections, or parts of sections, as shall be equal to such lands as the United States have sold or otherwise appropriated, * * * which lands thus selected * * * shall be held by the state of Iowa for the use and purpose aforesaid."

The general assembly of Iowa, by an act approved July 14, 1856, designated the Dubuque & Pacific Railroad Company as the corporation authorized to construct the line of railway from Dubuque to Sioux City, and to receive the lands granted in aid of the building of said line, and that company accepted the grant thus made, and entered upon the construction of the road. In the agreed statement of facts it is admitted that the line of said railway was located through Pocahontas county on or before September 30, 1856; that the railroad company had earned the quantity of lands certified to it; and that an agent appointed by the governor of the state selected the lands in controversy as part of the indemnity lands to which the company was entitled under the grant of May, 1856. By a certified copy of the records of the land-office at Washington it is shown that the lands in controversy, with others, were, on the twenty-third of December, 1858, certified by the commissioner of the general land-office as a correct list of the tracts of land selected by the agent of the state of Iowa to make up the deficiency within the six-mile limit; and this list was, on the twenty-seventh of December, 1858, duly approved by the secretary of the interior, subject to the conditions of the act of May 15, 1856, and to any valid interfering rights to any of the tracts embraced in said list. In the agreed statement of facts it is stipulated "that John Hough was, at the time of his death, the owner of all the title ever acquired by the said railroad company," and the evidence shows that the complainants have succeeded to the rights and title of said John Hough. It also appears that complainants, and those under whom they claim, have paid the taxes levied on said lands since the year 1865. By the provisions of section 2449 of the Revised Statutes the certification of the lands as above described has the effect of a conveyance in fee-simple, and conveys as perfect a title as though a patent had been executed thereto. *Frasher* v.

*O'Connor,* 115 U. S. 102; S. C. 5 Sup. Ct. Rep. 1141. It thus appears that complainants' chain of title from the government is complete, and unless the defendant can show a superior or better right, complainants are entitled to the relief sought by their bill.

As already stated, defendant bases his claim to the realty upon the provisions of the swamp-land act of 1850. In the agreed statement of facts it is stipulated that Pocahontas county was organized as a county in 1859, and in the same year duly and legally selected the lands in question as part of the swamp lands granted to the state by the act of congress of 1850; that such selection was duly forwarded and filed as provided by law; that the interior department has never passed on the question of fact as to whether the lands were in fact wet and swampy, but has decided, as a matter of law, that they passed to the railroad company; that said lands have always been wild and uncultivated; that the defendant owns all the title that the state ever acquired to the lands under the swamp-land act; and that the evidences of his title have been of record in Pocahontas county since 1870. In the answer of defendant it is averred that the lands passed to the state under the swamp-land act; from the state to Pocahontas county under the several acts passed by the legislature touching the disposition of swamp lands; from the county by deed to John M. Stockdale; and, by two intermediate conveyances, from Stockdale to defendant.

By an act passed January 13, 1853, the legislature of Iowa granted the swamp lands to the counties in which they were situated, and by an act passed January 25, 1855, the legislature provided that "no swamp or overflowed lands granted to the state, and situate in the then unorganized counties, shall be sold or disposed of till the title to said lands shall be perfected in the state;" whereupon the titles to said lands shall be transferred to the counties upon payment by the latter of the expenses incurred by the state in selecting said lands. It is not shown that the title to the lands in question has ever been perfected in the state under the swamp-land act; that is to say, it does not appear that any patent has been issued therefor to the state as contemplated by the swamp-land act. It thus appears that the state of Iowa, by the provisions of the swamp-land act, became entitled to all the lands belonging to the United States within the borders of the state which were swamp or overflowed, and had the power to perfect its title thereto by causing the proper selections to be made and certified to the department, and procuring a patent therefor; the state being charged with the trust or duty of applying the proceeds realized therefrom to the drainage and reclaiming of the said lands, so far as necessary.

By the railroad land-grant act of 1856, the state became entitled to the alternate sections within six miles of certain proposed lines of railway, with the right to select, within a limit of fifteen miles, lands to make up any deficiency within the six-mile limit caused by

a previous disposition of the lands by the United States. The state, through its agent lawfully appointed, selected the lands in controversy in 1858, as part of the indemnity lands to which the Dubuque & Pacific Railroad Company was entitled, and the same were duly certified by the secretary of the interior, thus, in effect, patenting them to the railroad company by order and direction of the state. When this was done, to-wit, in 1858, Pocahontas county was not organized, nor had it acquired any vested right in the swamp lands within its borders. It was not a purchaser for value, and the state could, by legislative enactment, have changed the disposition of the lands at any time before the organization of the county and the completion of the title therein. When, therefore, the lands were selected by the state, and claimed as indemnity lands under the railway grant, and the United States had conveyed the same to the railroad company, did not such action on part of the state defeat its right to subsequently claim the lands under the swamp-land grant? The railroad company was a purchaser for value, in that it had agreed, in consideration of receiving the quantity of lands specified in the act of 1856, to construct the line of railway from Dubuque to Sioux City. After procuring the conveyance of these lands to the railroad company it would be most unjust to permit the state to assert a right to the same lands under the swamp-land act. True, the certificate executed by the commissioner, and approved by the secretary of the interior, provides that the lands are certified subject to any valid interfering rights, but that restriction cannot be held to be a reservation in favor of the state of Iowa, under the facts of this case. Under the act of 1856, and the acts of the legislature of Iowa, the railroad company, through the state, was entitled to demand and receive from lands within the fifteen-mile limit sufficient to make good the deficiency within the six-mile limit. The lands in controversy are within the fifteen-mile limit. The duty of making the selection of the indemnity lands is left with the state, and the agent appointed by the governor selects the lands in question, and the same are certified to the railroad company.

If, under these circumstances, it should now be held that the state is not debarred from asserting a claim to these lands under the swamp-land act, it is clear that a fraud would thereby be perpetrated upon the company and its grantees. Should it, however, be held that it was open to the state, or its grantees, to contest the validity of the transfer to the railway company, such contest must certainly be made within a reasonable time. The county, upon its organization in 1859, caused these lands to be listed as swamp lands, and the list was forwarded through the proper channels to the department at Washington. The commissioner refused to certify the lands under the swamp-land act, holding, as a matter of law, that the certification made thereof in 1858 to the railway company defeated the right to claim them under the swamp-land act. It does not appear that

the county or its grantees have since taken any further action in the premises. They knew that the lands had been certified to the railway company in 1858; that the commissioner of the land-office had refused to certify the lands under the swamp-land act; that the railway company and its grantees were claiming the land, and asserting title thereto by paying the taxes assessed thereon; and yet, for 25 years, the defendant and his grantors have done nothing to perfect the evidence of their title, or to assert any right to the land. Certainly, their claim must be regarded as stale, and not entitled to favorable consideration at this late day.

If, however, it is still open to defendant to make claim to the lands under the swamp-land act, it is certainly incumbent upon him to clearly establish the fact that these lands were, in 1850, of the character intended to be conveyed by that act. The defendant is, in effect, asking the court to reverse the action of the land and interior departments of the government in conveying these lands to the railway company, after a lapse of over a quarter of a century, basing his claim upon the allegation that these lands were in fact, in 1850, swamp or overflowed lands. Most clearly, the burden is upon defendant of establishing this allegation of fact, constituting, as it does, the sole foundation of his claim, by satisfactory and convincing evidence. *Buena Vista Co.* v. *Railroad Co.*, 112 U. S. 165; S. C. 5 Sup. Ct. Rep. 84. It cannot be expected that a title based upon a patent from the government, or its equivalent, which has stood unimpeached for so many years, can be successfully questioned, except upon most clear and cogent evidence.

In support of the allegation that the lands in controversy were swampy, and therefore included within the act of 1850, the defendant has introduced the testimony of three witnesses. Their testimony, however, applies only to two of the 40-acre tracts in controversy. As to the N. W. ¼ of the S. E. ¼ of section 11 there is no testimony whatever. Touching the other quarter sections the evidence adduced by defendant's witnesses, standing alone, is sufficient to justify the finding that these pieces are wet, swampy, and overflowed in parts, and to an extent sufficient to bring them within the terms of the act of 1850. In rebuttal, however, the complainants have also introduced three witnesses, who testify to the nature of the land, and, according to their testimony, while there are some wet places upon these forties, yet the greater part thereof is susceptible of cultivation without being drained. In other words, the testimony of complainants' witnesses upon this subject, standing alone, is sufficient to show that these lands are not of the character of lands described in the act of 1850. The witnesses on both sides seem to be equally disinterested, to have had substantially equal means of knowledge of the character of the lands, and their testimony leads to exactly opposite conclusions upon the point at issue. The court is not justified in disregarding the evidence of complainants' witnesses on this question, and the evidence,

therefore, being, at the best, evenly balanced upon this point, it follows that defendant has failed to show, by a fair preponderance of evidence, even if that was sufficient, that these lands were, in 1850, of such a character as to bring them within the description of lands intended to be conveyed by the swamp-land act. Complainants are therefore entitled to a decree as prayed for.