UNITED STATES *v.* UNION PAC. RY. CO. *et al.*

(*Circuit Court, D. Colorado.* February 7, 1889.)

1. PUBLIC LANDS—RAILROAD GRANTS—CONSTRUCTION.

Under the Union Pacific Railroad acts defendant company had a land grant *in præsenti* from Kansas City to Cheyenne via Denver, and its road was in process of construction. The Denver Pacific Railway & Telegraph Company had graded a road-bed from Cheyenne to Denver. Subsequently, by act Cong. March 3, 1869, entitled "An act to authorize the transfer of lands granted to" defendant company, to the latter, defendant was authorized to contract with that company for the construction and operation of defendant's road between Denver and Cheyenne, "and to grant to said Denver Pacific Railway & Telegraph Company the perpetual use of its right of way and depot grounds, and to transfer to it all the rights and privileges" pertaining to that part of the road. The act further provided that "said companies are hereby authorized to mortgage their respective portions of said roads, as herein defined," for a certain amount per mile, "and each of said companies shall receive patents to the alternate sections of land along their respective lines of road," in the same manner as under the previous grant to defendant. *Held* that, under the act of 1869, defendant's grant remained a continuous grant from Kansas City to Cheyenne, and the only effect of the act was to divide the grant between the two companies.

2. SAME—INTERPRETATION BY LAND DEPARTMENT.

While it is true that, under the general rule that railroad land grants are to be limited to lands situated at right angles to the general line of the road, there would be a tract south and west of Denver which might not be covered by the grant, because outside of the angles of both branches of the road, yet, where the land department has construed the grant and the act of 1869 to embrace such tract, and has issued patents accordingly, and such construction has remained unchallenged for 15 years, and rights of third persons have attached, the court will not set aside such patents, there being some doubt as to the true construction of the acts.

In Equity. Bill to set aside land patents. On demurrer to bill.

*H. W. Hobson,* Dist. Atty., for complainant.

*Teller & Orahood, Oscar Reuter, Bartelo & Blood, Hugh Butler, A. L. Doud, W. H. Mahone, Wells, McNeal & Taylor, Albert Smith, Wm. B. Mills, H. P. H. Bromwell,* and *Edward L. Johnson,* for defendants.

BREWER, J. This is a bill filed by the United States against the Union Pacific Railway Company and 173 other parties, to set aside patents to several tracts of land lying south-west and adjacent to the city of Denver. The facts are these: Prior to the 3d of March, 1869, the Kansas Pacific Railway Company, then known as the Union Pacific Railway Company, Eastern Division, was engaged in constructing a line of railway from

Kansas City to Cheyenne, passing through Denver. Under the Union Pacific Railroad acts it had a land grant along the entire line. The Denver Pacific Railway & Telegraph Company, a corporation organized under the laws of the territory of Colorado, had graded a road-bed from Cheyenne to Denver. On that day, at the instance of the Kansas Pacific Railway Company, congress passed an act authorizing it to contract with the Denver company for the construction of the line from Denver to Cheyenne. The contract was made, the road was built, lands were selected by the companies along the entire line as though it were one continuous line, with a single grant, and patents issued therefor. Now, the contention of the government is that the act of 1869 modified the prior Union Pacific Railroad acts so as to cut off the grant of the Kansas Pacific at Denver, and to make a new and independent grant to the Denver Pacific from Denver to Cheyenne; and, if that were the true construction of that act, this would result. The Kansas Pacific Railroad enters Denver from the east, running in an easterly and westerly direction. The Denver Pacific enters from the north, running in a northerly and southerly direction. The two roads make a junction something in the nature of a right angle. Now, it is familiar law that railroad grants are limited by lines drawn at the *termini* at right angles to the general direction of the road, so that the Kansas Pacific grant would be terminated by a line running through Denver in a northerly and southerly direction, while the Denver Pacific grant would likewise be limited by a line run through Denver in an easterly and westerly direction. Obviously all lands lying to the south-west of Denver, west of the terminus of the Kansas Pacific road and south of the terminus of the Denver Pacific, would be beyond the reach of either grant, and these are the lands which are the subject of this suit.

Of course the important question, then, is to determine the true construction of the act of March 3. That act reads as follows:

"An act to authorize the transfer of lands granted to the Union Pacific Railway Company, Eastern Division, between Denver and the point of its connection with the Union Pacific Railroad, to the Denver Pacific Railway & Telegraph Company, and to expedite the completion of railroads to Denver, in the territory of Colorado. Be it enacted by the senate and house of representatives of the United States of America in congress assembled, that the Union Pacific Railway Company, Eastern Division, be, and it hereby is, authorized to contract with the Denver Pacific Railway & Telegraph Company, a corporation existing under the laws of the territory of Colorado, for the construction, operation, and maintenance of that part of its line of railroad and telegraph between Denver City and its point of connection with the Union Pacific Railroad, which point shall be at Cheyenne, and to adopt the road-bed already graded by said Denver Pacific Railway & Telegraph Company as said line, and to grant to said Denver Pacific Railway & Telegraph Company the perpetual use of its right of way and depot grounds, and to transfer to it all the rights and privileges, subject to all the obligations, pertaining to said part of its line."

"Sec. 2. And be it further enacted, that the said Union Pacific Railway Company, Eastern Division, shall extend its railroad and telegraph to a connection at the city of Denver, so as to form with that part of its line herein

authorized to be constructed, operated, and maintained by the Denver Pacific Railway & Telegraph Company, a continuous line of railroad and telegraph from Kansas City, by way of Denver, to Cheyenne, and all the provisions of law for the operation of the Union Pacific Railroad, its branches and connections, as a continuous line, without discrimination, shall apply the same as if the road from Denver to Cheyenne had been constructed by the said Union Pacific Railway Company, Eastern Division; but nothing herein shall authorize the said Eastern Division Company to operate the road or fix the rates of tariff for the Denver Pacific Railway & Telegraph Company.

"Sec. 3. And be it further enacted, that said companies are hereby authorized to mortgage their respective portions of said road, as herein defined, for an amount not exceeding $32,000 per mile, to enable them respectively to borrow money to construct the same; and that each of said companies shall receive patents to the alternate sections of land along their respective lines of road, as herein defined, in like manner, and within the same limits, as is provided by law in the case of lands granted to the Union Pacific Railway Company, Eastern Division: provided that neither of the companies hereinbefore mentioned shall be entitled to subsidy in United States bonds under the provisions of this act."

To determine the true meaning of this act it must be borne in mind that congress had already authorized a single line with a continuous grant from Kansas City to Cheyenne, and that that line was in process of construction. Now this act simply authorizes the Kansas Pacific to contract for the construction of a part of this line, and to transfer to the company with which it is authorized to contract a proportionate share of its own grant. There are no words of grant anywhere to be found in the act, nor is there any language which, by any construction, can be held to indicate a purpose on the part of congress to reduce the grant already made. In the first section the authority given is to contract for the construction, operation, and maintenance of that part of its line of railroad, etc., and to grant a perpetual use of its right of way and depot grounds, and to transfer rights and privileges. The second section, which perhaps is not so vital, provides for the operation of the two parts as one continuous line of railroad and telegraph, and the third section authorizes each company to mortgage its respective portion of said road. The express language—the whole drift of the act—means simply transfer, nothing more. Such, also, is the purpose as indicated by the title, "An act to authorize the transfer of land," etc.; and that the title may sometimes have a significance, see *U. S.* v. *Fisher*, 2 Cranch, 358; *U. S.* v. *Palmer*, 3 Wheat. 610, in which last case Chief Justice MARSHALL says: "The title of an act cannot control its words, but may furnish some aid in showing what was in the mind of the legislature." Furthermore, it must be borne in mind that the grant made by the Union Pacific acts was one *in præsenti*. *Railway Co.* v. *Railway Co.*, 97 U. S. 491. The rights of the Kansas Pacific were fixed and vested; and while it is true that grants from the government are to be construed favorably to the government and against the grantee, yet it is also true that the intent of congress controls, and should be sought from the language of the act making the grant, and that to work a forfeiture or reduce a grant already made the intent of congress should be clear. *Railway Co.* v. *Mc-*

*Gee*, 115 U. S. 474, 6 Sup. Ct. Rep. 123.   That the intent of congress was as suggested, appears also from the debate at the time of the passage of the act.   Senator Harlan said: "This bill does not grant an additional acre of land, or a single dollar of bonds or anything else.   It enables two companies to arrange for the construction of a line; that is all there is in the bill."   The language of the act, the title of the act, and the tone of the debate, all point unmistakably, as it seems to me, to the construction I have given.   Indeed, there is but a single expression which throws doubt upon this, and that is that portion of the third section which provides that each of said companies shall receive patents to the land along their respective lines of road; and yet that is perfectly consistent with the idea of division and transfer.   Perhaps an expression like this, "their portion of the line," would have been more exact; and yet the meaning of the expression is perfectly clear.   I do not place much reliance on the act of June 20, 1874, (18 U. S. St. at Large, 111,) for that seemed designed simply to regulate the operation of the Union Pacific Railroad system; and yet it closes with this general language, which is, to say the least, in harmony with that which has been heretofore suggested:

"And it is hereby provided that for all the purposes of said act, and of the acts amendatory thereof, the railway of the Denver Pacific Railway & Telegraph Company shall be deemed and taken to be a part and extension of the road of the Kansas Pacific Railroad to the point of junction thereof with the road of the Union Pacific Railroad Company at Cheyenne, as provided in the act of March 3, 1869."

I therefore hold that the act of 1869 in no manner diminished the grant, but that it remained as a continuous grant from Kansas City to Cheyenne, and that its only effect was to divide the grant between the two companies.

But it is further insisted by the government that, even if the grant is to be construed as a single and continuous one, these lands were not within its scope.   The grant was "of every alternate section of public land designated by odd numbers, to the amount of five alternate sections per mile on each side of said railroad on the line thereof."   12 U. S. St. at Large, 489, § 3.   This amount was afterwards raised to 10 sections. 13 U. S. St. at Large, 356.   Now, treating this as a continuous line, it forms, as I said, about a right angle at Denver.   It is insisted by the counsel for the government that the grant is to be limited to lands situated at right angles to the general line of the road.   Hence, in coming from the east to Denver, no land falls within the grant lying west of Denver, and in coming south to Denver, none south of Denver.   Of course, within the right angle the full amount of lands could not be found, because there is an overlapping of the two lines of direction, whereas opposite to the right angle, and south-west of Denver, the lands would not be reached by any line run at right angles to the line of direction.   It is also insisted that whatever lands may be lost at the right angle on the one side of the road cannot be made up by lands taken from the other side. *U. S.* v. *Railroad Co.*, 98 U. S. 334.   There is some plausibility in this

contention, but the fact is that the selection is largely a matter of administration. Few railroads, the recipients of land grants, run their lines in a constant and straight direction, either north or south, east or west; but they are built along such routes as best subserve the purposes of their business, making many curves, and going in different directions, and the selection of land which will best fill out the intent of the grant must be, in the nature of things, as it has been, in fact, largely intrusted to the officers of the land department, and their determination cannot be successfully challenged. But assuming that there may be doubt as to whether the construction which I have placed upon the act of 1869 is the true one, and whether the proper administration of the grant looking upon it as a continuous one should have included these lands, the fact remains that this act was so construed, and this grant so administered, more than 15 years ago, and has remained unchallenged from that time until within the last two years. The question was brought directly before the land department, decided by it, and on appeal its decision affirmed by the secretary of the interior. The lands were awarded to the railroad company, and from time to time, as demanded, have been patented. Innocent parties have bought on the faith of the title as evidenced by the patents from the government, and at this late day something more than a mere doubt must exist to justify the divesting of titles thus sanctioned, and sanctioned for so long a time. *U. S.* v. *Railway Co., ante,* 68.

Authorities are not wanting in the supreme court of the United States, that in cases of doubt the courts will not lightly disturb an interpretation placed by the executive departments of the government. Justice TRIMBLE said in the case of *Edwards' Lessee* v. *Darby,* 12 Wheat. 206–210, that such uniform interpretation by the executive department was "entitled to very great respect;" Justice STORY, in *U. S.* v. *Bank,* 6 Pet. 29–39, that it "would, of itself, furnish strong grounds for a liberal construction;" Justice MILLER, in *Peabody* v. *Stark,* 16 Wall. 240–243, that "in the absence of a clear conviction on the part of members of the court on either side of the proposition in which all can freely unite, we incline to adopt the uniform ruling of the office of the internal revenue commissioner;" Justice SWAYNE, in *U. S.* v. *Moore,* 95 U. S. 760–763, that "it ought not to be overruled without cogent reasons;" Chief Justice WAITE in the case of *U. S.* v. *Pugh,* 99 U. S. 265–269, a case which, he says, is "by no means free from doubt," calls the principle contended for "a familiar rule of interpretation." Justice WOODS, in the case of *Brown* v. *U. S.,* 113 U. S. 568, 571, 5 Sup. Ct. Rep. 648, after stating that, if the question under consideration were a new one, "the true construction of the section would be open to doubt," concludes that the principle contended for, "in a case of doubt, ought to turn the scale." Justice HARLAN, in the case of *U. S.* v. *Philbrick,* 120 U. S. 52, 59, 7 Sup. Ct. Rep. 413, says: "Since it is not clear that the construction was erroneous, it ought not now to be overturned." Justice BLATCHFORD said in *U. S.* v. *Hill,* 120 U. S. 169, 182, 7 Sup. Ct. Rep. 510, "that the principle contended for has been applied by the supreme court as a wholesome one for the establishment and enforcement of justice between the government and

those who put faith in the action of its constituted authorities, judicial, executive, and administrative;" and Justice FIELD, in *Robertson* v. *Downing*, 127 U. S. 607, 613, 8 Sup. Ct. Rep. 1328, that "it ought not to be overruled without cogent reasons." It is well said by counsel that "it is interesting to note the growth of this principle in our law. From the time Justice TRIMBLE announced it so cautiously in 1827 it has gained strength every time it was again considered by the court. Impelled by the force of its inherent justice, every judge who has taken it up has stated it more strongly than it was stated before." And this is a case where that doctrine is eminently worthy of application. The supreme court of the United States has also in two recent and important cases emphasized the necessity of reliance upon the stability of title evidenced by patents from the government. See *Maxwell Land Grant Case*, 121 U. S. 325, 7 Sup. Ct. Rep. 1015; *Iron Co.* v. *U. S.*, 123 U. S. 307, 8 Sup. Ct. Rep. 131. Such reliance should not be disturbed in the case at bar. The demurrer will be sustained.