### STATE OF MICHIGAN v. JACKSON, L. & S. R. CO. et al.

(Circuit Court of Appeals, Sixth Circuit. July 2, 1895.)

#### No. 266.

PUBLIC LANDS—SWAMP-LAND ACT—ESTOPPEL AGAINST STATE.

The state of Michigan filed a bill to remove clouds upon the title to lands to which it claimed to be entitled, under the grant in the swamp-land act of September 28, 1850, by reason of such lands having been included in the original surveys of public lands in the state, which were ascertained to be fraudulent and erroneous, but which surveys, as claimed by the state, were adopted at the time of the grant, as the means of ascertaining the lands covered by it. It appeared that, in the course of the administration of the grant, under the statutes of the state and the United States, and by the acts of the various officers of the state and general governments, the grant had been adjusted upon the general principle and purpose of reaching the real truth in regard to the character of the lands, and the lands, so ascertained to belong to the state, had been patented to it, largely upon the basis of the corrected surveys, excluding the lands now claimed, which were in fact not swamp lands, and that the particulars of such adjustment had been generally known, and had been set forth in the official reports of the officers of the state land office, and communicated to the legislature in messages of the governor, and that such adjustment had remained undisturbed for many years. The lands held by the defendants in this suit had been included in a grant by the United States to the state, in aid of the construction of a railroad, and, after being certified to the state as passing by such grant, in lists which remained on file in the state land office for several years, were patented to the railroad company. *Held*, that the claim of the state was without equity, and that it could not be permitted, after so long a period of acquiescence, during which third parties had acquired rights in reliance upon the validity of its public action, to assert such claim, in disaffirmance of the acts of its officers, whether done in excess of their powers or not. Lumber Co. v. Rust, 68 Fed. 155, approved.

Appeal from the Circuit Court of the United States for the Eastern District of Michigan.

This was a suit by the state of Michigan against the Jackson, Lansing & Saginaw Railroad Company, Henry B. Ledyard, Ashley Pond, and Orlando M. Barnes, to remove a cloud upon the title to land claimed by the state. The suit was commenced in a court of the state of Michigan, and was removed to the United States circuit court, where the bill was dismissed. Complainant appeals. Affirmed.

The bill in this case was filed on December 13, 1887, on behalf of the state of Michigan in the circuit court of the state for the county of Ingham. It was subsequently removed on petition of the defendants into the circuit court of the United States. The object of filing the bill was to remove a cloud alleged to have been cast upon the complainant's title to about 50,000 acres of land in the southern peninsula of the state by patents of the United States issued to the defendant railroad company, to restrain the cutting of timber thereon, and to obtain an accounting for timber already removed therefrom. The grounds upon which the state claims, in its bill, to establish its title are these: First, that by the act of congress of September 28, 1850, all the swamp and overflowed lands in the state which had not been previously disposed of by the United States were granted to the state; second, that the identification of the lands as of the character granted by the act was intrusted to the secretary of the interior; third, that the secretary proffered to the state its choice of certain methods for the ascertainment of the lands covered by the grant, one of which methods, namely, that of adopting the field notes of the survey on file in the surveyor general's office as the test of the character of the lands, was accepted by the state; fourth, that the lands in question were by that test swamp lands, and so within the grant; fifth, that, in pursuance of instructions from the general land office the surveyor general prepared maps and lists showing what lands were swampy, and that this was an identification of the lands, binding upon the United States and the state of Michigan; sixth (by an amendment of the bill), that the lists so prepared by the surveyor general were reported to the land department, and were approved by the secretary, and that, in consequence of that approval and the several acts of congress confirming those lists, the state's title became full and complete.

The defendants, in respect to such of the lands in controversy as they now or at any time have claimed to own, rely upon patents of the United States issued to the defendant, the Jackson, Lansing & Saginaw Railroad Company, in the years 1869 to 1873, inclusive, in execution of the grant of lands to the state of Michigan, to aid in the construction of certain railroads therein, by act of congress of June 3, 1856, and which grant, in respect of the lands here in controversy, was conferred upon the Amboy, Lansing & Traverse Bay Railroad Company by the act of the legislature of Michigan of February 14, 1857. Lists of the lands passing by the grant were made and certified to the state by the secretary of the interior and filed in the office of the state land commissioner at various times extending from March 14, 1861, to May 12, 1864,— that is to say, about eight years, in the average, before they were patented. The defendants claim that the benefit of this grant inured to the Jackson, Lansing & Saginaw Railroad Company by virtue of a contract between it and the Amboy, Lansing & Traverse Bay Railroad Company, made under the provisions of an act of the legislature of Michigan approved March 14, 1865, authorizing such a contract and a transfer of the grant to the Jackson, Lansing & Saginaw Railroad Company, and another act, that of February 7, 1867, in confirmation of the rights of the last-named company under said contract. Prior to this contract the Amboy, Lansing & Traverse Bay Railroad Company had earned a part of the lands granted, and they were patented to that company. Those, although claimed by the complainant in this bill, did not pass to the Jackson, Lansing & Saginaw Railroad Company by the contract, and the title thereto is not represented by the parties to this suit. Others of the lands claimed in the bill, amounting to nearly one-half of the whole, had been

sold and conveyed, prior to the institution of this suit, to other parties, whose title is likewise here unrepresented. The lands in which the defendant railroad company retains a beneficial interest are held in trust by the defendants Ledyard, Pond, and Barnes to secure the payment of the bonds of said company under a contract made by it with the Michigan Central Railroad Company. Other facts, relating in the main, to the administration of the swampland grant in Michigan, and to the appropriation of the lands in controversy to the railroad grant of June 3, 1856, are stated or referred to in the opinion.

Fred. A. Maynard, Atty. Gen. (Frank E. Robson, of counsel), for the State of Michigan.

, Ashley Pond and O. M. Barnes, for appellees.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

Having stated the nature of the case as above, SEVERENS, District Judge, delivered the opinion of the court.

Shortly prior to the hearing of the present case the decision of this court was announced in the case of Lumber Co. v. Rust, 68 Fed. 155, and two other cases of Same Plaintiff v. Other Defendants, 68 Fed. 170, all of which came here on writs of error from the same court from which the present appeal was taken. They were actions of ejectment brought by parties deriving title under patents from the state of Michigan to recover the possession of lands which were claimed to have inured to the state under the swamp-land act of 1850 against parties holding under patents from the United States by purchase. The leading facts were, in the main, similar to those involved in the present suit, but some new features are developed in this which were not disclosed in the former cases; and they also differed in this, that those were actions at law while this is upon a bill in equity. A brief account of so much of the proceedings taken in behalf of the United States and of the state of Michigan for the adjustment of the swamp-land grant as was deemed material to the decision of those cases was given in the statement preceding the opinion in the principal case. Some further, and in some respects more definite, facts are brought to our attention in the present case, which will be alluded to as we proceed. The claim of title in the state as to some of the lands mentioned in the bill is based upon the proposition that the acceptance by the state of the offer to take the field notes then on file in the surveyor general's office as the basis on which the state would receive the granted lands operated as a binding agreement between the two governments whereby an identification of the lands was accomplished, and that thereupon the title passed to the state. The title to other tracts is based upon the preceding facts, supplemented by the additional fact that the surveyor general, in pursuance of instructions, made from the original surveys, and certified, lists, including these tracts, to the land department, wherein they were described as swamp lands. As to others, the title rests upon the foregoing and the further facts that the lists then made from the original surveys in which they were included were approved by the secretary of the interior.

In respect to such of the lands as were included in any list which had then been filed in the land department, it is claimed that the title

was confirmed to the state by the act of March 3, 1857. These are of two classes: First, lists made up before the resurvey from the notes and maps of the old survey, but which latter were superseded by the former, which showed they were not swamp; and, second, a few descriptions which are shown to be swamp by the resurvey, but were not by the old, and which descriptions are in townships in which the adjustment of the grant was made upon the basis of the old survey. As to the first of these classes, the contention that the title to the lands was confirmed in the state by the act of 1857 rests upon the supposition that congress intended to confirm lists which had been under consideration by the secretary of the interior, ascertained and determined to be founded on fraud and error, set aside and replaced by lists which were based on surveys which the department accepted as correct. As to the second, they were found in localities in which the old survey had been, by mutual consent of the state and the general government, made the basis upon which the lands were selected, and upon which they had been actually patented. The question in respect to what effect should be given to the selection and patenting of the land upon the old survey arose during the pendency of the proceedings for settling the grant. The position of the land department was that, in so far as the townships in which the land had been patented upon the old survey and lists, and the errors contained therein had passed beyond correction by the department, the selections should stand, and not be affected one way or the other by the resurvey. This was eminently fair to the state, and by it the state on the whole secured a great advantage, for the uplands described in the first survey as swamp, and patented, far exceeded the lands not therein described as such, but afterwards found to be swamp. And this position was acquiesced in by the state, and it became a part of the basis on which the settlement was reached. With respect to this, as in respect to the other matters adjusted in the course of the administration of the grant, it would be manifestly unjust for the judicial department to overhaul the proceedings, and, while not releasing one party from the bonds imposed upon it, give to the other free license to gather what it can reach.

It has been repeatedly held by the commissioners of the general land office that, after the patenting of all the lands in townships found by the old survey to be swamp,—such patenting having been based upon the old survey,—the state was not entitled to come in with a claim to take under the new survey also; in other words, that it could not claim under two surveys which were inconsistent with each other. In a letter to the commissioner of the state land office, dated June 15, 1874, Commissioner Burdett, of the general land office, rejecting a claim presented by the state commissioner of lands standing as swamp in the lists after resurvey, in localities where the patenting had already taken place on the old survey, said: "In such cases this office has always refused to admit new selections in the same townships when the first or old selections have been certified to the state." And there was no appeal by the state from this decision. And see, in this connection, Chandler v. Min-

ing Co., 149 U. S. 79, 13 Sup. Ct. 798, where the effect of the certification of lands in a given locality, and the refusal of the secretary to certify others therein, in excluding the right of the state, was discussed by Mr. Justice Jackson in delivering the opinion of the court. And, further, we are of the opinion that the act of 1857 was intended to have application to cases of non-action by the secretary, and not to cases which were already covered by his action.

In the view which we take of the case, it is not necessary to deal with each of the various classes of lands involved therein, separately. The present record exhibits in a striking way the false and fraudulent manner in which many of the original surveys in Michigan were conducted, and their condition at the time when the swamp-land act was passed, and the legislature of the state signified its acceptance of the field notes as the basis for the adjustment of the grant. Among other things, having special reference to the lands now in controversy, it appeared, by the report of the surveyor general, of November 5, 1849, made nearly a year before the passage of the granting act, that from the authorized examination of the original surveys it had been ascertained that in 5 districts, comprising 38 townships, in which nearly all the lands in this suit are located, only a small proportion of the lines had been run, and that few of the corners had been established, and those were so far out of their proper place as to be worse than useless, and that in 13 of the townships not more than $1/30$ of the lines had been run at all. In the case of Lumber Co. v. Rust, we expressed our reasons for dissenting from the positions necessary to be taken to support the state's title to any of the lands claimed by it and involved in the present controversy. Further consideration of the subject confirms our belief that the conclusions then reached are sound and just, and we think that the application of the strictly legal principles maintained in that case would be decisive against the claim of the state in this.

What had preceded in the execution of both grants was very much a matter of administration between the United States and the state, under the statutes of both, upon the true construction of which there had at the outset been doubt and difference of opinion. In such a case the courts will "lean in favor of a construction given to a statute by the department charged with the execution of such statute, and, if such construction be acted upon for a number of years, will look with disfavor upon any sudden change whereby parties who have contracted with the government upon the faith of such construction may be prejudiced." U. S. v. Alabama G. S. R. Co., 142 U. S. 615, 621, 12 Sup. Ct. 306. In U. S. v. Hill, 120 U. S. 169, 7 Sup. Ct. 510, it was said that this principle "has been applied by the supreme court as a wholesome one for the establishment and enforcement of justice between the government and those who put faith in the action of its constituted authorities, judicial, executive, and administrative." And see, also, U. S. v. Macdaniel, 7 Pet. 1, and U. S. v. Union Pac. Ry. Co., 37 Fed. 551, where Mr. Justice Brewer, at page 555, collected a large number of authorities of the same import, and noted the growth of this principle of law. This is not precisely the ground upon which an estoppel in pais, in its ordinary sense, is

based, but the doctrine rests ultimately upon the same rule of reason,—that of concluding the principal by the action of its agents, when such action has been of long continuance with the knowledge of, and without dissent from, the principal, and where other parties have shaped their conduct accordingly and founded their interests thereon.

In equity there is little in the complainant's case to commend it to the favor of the court. To begin with, it is not contended that these lands are of the character intended by congress to be granted to the state. It affirmatively appears that they are not. The bill rests upon the assumption that by some miscarriage the state has acquired title to these, which are parcel only of more than a million acres in the state which the record shows to be standing in the same plight. Whatever may have been the original understanding of the legislature of the state (a matter we have discussed in the former case), it is clear that the state co-operated with the general government in the final adjustment of the grant of 1850 upon the general principle and purpose of reaching the real truth and justice of the matter, and by a method wholly inconsistent with its present contention. By the method thus assented to, it has received a large amount of land which it would not otherwise have obtained, and which, or the proceeds of the sales thereof, it keeps. If there has been a departure from the original intention of the legislature by the agents of the state intrusted with the duty of looking after its interests in the settlement of the grant, the course pursued has been public and open. It would seem that what was well known to those at all conversant with the general subject, and being of facts and transactions extending through so many years, should be regarded as known to the state. But it is not necessary to rely upon presumptions. Express knowledge was communicated to successive legislatures by the reports of the commissioner of the state land office, and messages from the executive. It was informed, as early as 1869, that by the method which had been pursued and with which it had been previously made acquainted, the land grant had been practically adjusted and substantially closed up. It had then received the "nearly 6,000,000 acres of swamp lands," which Governor Crapo said, in his message to the legislature in 1867, "were donated to the state by the act of congress of 1850." That communication indubitably showed the understanding of the governor to be that the state had then acquired substantially all the lands due to it under the grant.

It is a rule devised for the protection of the public that the state shall not be held responsible for the acts of its agent when done in excess of his powers. Assuming, for the moment, that there was an excess of power by the officers of the state, what is the application of the above-stated rule to the circumstances as we now find them? It is a fit rule to apply to a transgression which the state has not condoned; but it has no application to a case in which no question of morals is involved, but where a course of action has been pursued with the knowledge and acquiescence of the state in the management and disposition of its property interests for so long

a time that the public have been led to reasonably believe that they may act upon the assumption that what has been done with the sanction of the state was validly accomplished. To apply the rule as the state asks us to apply it here would be to pervert it to an agency for mischief and wrong. The public have supposed, and had a right to suppose, that they could deal with the lands in the state upon the status given them by the action of the public officials of the state and of the United States, without dissent from either government. In a justly-inspired confidence in the integrity and validity of this public action, several hundred thousand acres of land in the state have been bought from the United States by citizens who are bona fide purchasers, and whose titles are mere nullities if this contention of the state can be maintained. It was for the public interest that the status of the lands should be settled, and that they should not remain as stumbling-blocks in the progress of the improvement of the country. The state cannot be permitted to say that it has slept during all this long period, and abandoned its sovereign duties to its citizens, as well as its reciprocal moral obligations to the government which had made to it so magnificent a gift. The state is not to be regarded as a mere machine, incapable of intelligence or conscience. And, while it is necessary and right to restrain or annul the unauthorized acts of its agents by which its interests might be impaired, yet there must come a time, after long-continued acquiescence in public action with knowledge of it, when, in the interest of its citizens, the state itself shall be precluded from despoiling others by the assertion of its original rights.

With respect to this defendant, the railroad company, it is shown that the state employed the grant made by congress to aid the state as an inducement to the building of the road, and in thus securing a public improvement; that these identical lands were certified to the state as passing by the grant in lists which remained on file in the state's land office for several years before they were at length patented by the United States to the company upon the completion of the work; and that the railroad company earned the lands is not questioned. Nor is there any room for doubt that it earned and received them in reliance upon the right of the general government to grant them and give a good title. It was equivalent in substance and effect to a purchase for value, and its good faith is not questioned except by the suggestion that the railroad company had notice by public record that the title was in the state. Here, too, as in the matter of the adjustment of the swamp-land grant, the executive officials participated in the appropriation of these very lands to the objects of the grant to aid the state in building railroads. The time has long gone by when the railroad company could obtain indemnity for the lands, and the state has given no sign of dissent until the filing of this bill. The facts that these lands had been certified to the state, to be conferred upon the railroad company of its adoption, and that they had been so conferred, had been manifest from the state's public records for more than 20 years.

The general doctrine of the immunity of the state for the unauthorized acts of its officials is clearly announced and firmly main-

tained in the decisions of the supreme court of Michigan.    Crane v. Reeder, 25 Mich. 320; Ellsworth v. Grand Rapids, 27 Mich. 250; Rogers v. Railroad Co., 45 Mich. 460, 8 N. W. 46; Lake Shore & M. S. Ry. Co. v. People, 46 Mich. 193, 209, 9 N. W. 249; Plumb v. City of Grand Rapids, 81 Mich. 381, 45 N. W. 1024.    It is needless to fortify this doctrine, as its necessity is everywhere conceded.    On the other hand, that court has recognized the reasonable limitations of the rule, and stated the counterpart, which it has not failed to apply in circumstances where the countervailing equities and reasons required it.    People v. Detroit & H. Plank Road Co., 37 Mich. 195; Attorney General v. Ruggles, 59 Mich. 124, 26 N. W. 419; State v. Flint & P. M. R. Co., 89 Mich. 481, 51 N. W. 103.

The distinction established by these cases and the former, cited as supporting the general rule, is one which we approve as resting on solid grounds of public and private justice and convenience.    The principles operating to create the distinction have been many times recognized in the federal courts and in those of other states.    A large number of such cases are collected in Bigelow, Estop. (4th Ed.) p. 331, in support of the proposition that, in a proper case, an estoppel is applicable to the state.    In the case of State v. Flint & P. M. R. Co., 89 Mich. 481, 51 N. W. 103, the state of Michigan filed its bill in the state circuit court against the Flint & Pere Marquette Railroad Company for a purpose similar to that of the present bill.    The facts were in all respects like those here shown.    The supreme court, when the case reached it, putting aside all other questions, held that the state was estopped by its own conduct from asserting a claim so injurious to the defendant, and in emphatic language rejected the bill as having no foundation in equity, justice, or good conscience. The court cites its own previous decision in Attorney General v. Ruggles, 59 Mich 124, 26 N. W. 419, and the following cases from the federal courts: U. S. v. McLaughlin, 30 Fed. 147; State v. Milk, 11 Fed. 389; Cahn v. Barnes, 5 Fed. 326; Hough v. Buchanan, 27 Fed. 328; Pengra v. Munz, 29 Fed. 830; U. S. v. Missouri, K. & T. Ry. Co., 37 Fed. 68.    To which may be added the more recent case of U. S. v. Willamette Val. & C. M. Wagon-Road Co., 54 Fed. 807, 55 Fed. 711, 718.

Portrayed upon the broad lines of its main features, the state's case is this: It has received in the administration of the swamp-land grant patents for about one-half the land based upon the original survey.    It is an open fact, upon which executive messages to the legislature have congratulated the state, that a large portion of the lands thus patented were not swamp, but were among the most valuable in the state.    The state has also received the other half of the lands granted, but these it has knowingly received according to the fact as demonstrated by the corrected survey.    The general government has, without objection from the state and upon the understanding that the state had got what belonged to it, retained and sold those lands which were falsely described as swamp in the old survey, and which upon the resurvey were proved to be valuable uplands, to parties purchasing in actual good faith.    It now seeks to recover these uplands from such purchasers, and founds its right

upon a grant which was not intended to convey them. Sometimes, perhaps, it happens that, by the application of stubborn and inexorable rules of law, such incongruities with justice occur. Possibly a court of equity might sometimes, by reason of extraordinary circumstances immediately controlling the decision, find itself in a situation where it would be required to disregard a wrong which has become an accomplished fact. But here, upon a nearer view of the facts and the principles applicable to the case, we find no difficulty in holding that, whether it be considered upon either its strictly legal or equitable aspects, it is without merit.

The decree of the court below should be affirmed.